UNITED STATES DISTRICT COURT
 SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                         :
IBEW LOCAL 90 PENSION FUND, on                           :
behalf of itself and all others similarly               :
situated,                                                :
                                                         :          11 Civ. 4209 (KBF)
                                    Plaintiffs,  :
                                                         :          OPINION & ORDER
                                                         :
                  -v-                                    :
                                                         :
DEUTSCHE BANK AG, et al.,                                :
                                    Defendants.:
-------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____             │
│ DATE FILED: March 27, 2013           │
└─────────────────────────────────────┘
```

KATHERINE B. FORREST, District Judge:

        Most lawsuits alleging violations of Section 10(b) of the Securities Exchange

Act of 1934 are based on purported misstatements or omissions.  Typically,

plaintiffs assert a series of alleged misstatements; defendants defend against such

allegations by isolating the statements (or omissions), one by one, and explaining

how they are not in fact actionable.  In such cases, each statement provides its own

battleground: who made it, what was his or her state of mind, was it false or

believed to be false at the time, did plaintiffs rely upon it or has it been factored into

the market price, and can the statement be causally tied to loss?

        Proceeding in this manner is, however, only one way to litigate a claim for a

violation of Section 10(b).  Plaintiffs may also allege that a course of conduct

amounts to a fraudulent scheme designed to mislead investors.  Such a course of

conduct may, but need not necessarily, involve separately actionable statements.

Some cases allege violations of Section 10(b) that include both a scheme to defraud and a series of misstatements or omissions.  This is such a case.

Plaintiffs here assert that Deutsche Bank and four individuals in its senior management oversaw a scheme to inflate the company's stock price and maximize profits.  According to plaintiffs, defendants effectuated their scheme by originating or acquiring residential mortgages and by packaging them into residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs"), which they knew presented far greater risk than they told the market.

According to plaintiffs, defendants knew that the market had an appetite for such securities, that the bank benefitted by having the revenues associated with sales of such securities prop up its stock price, and they also knew that the RMBS and CDOs were increasingly risky and approaching junk status.  Indeed, the bank was sufficiently certain that such securities would lose value that they allowed a trader to take a multi-billion dollar short position on (that is, a bet against) RMBS and CDOs, some of which the bank itself had structured and marketed.

The bulk of the allegations in the Amended Complaint are drawn from alleged misconduct set forth in a report prepared by the U.S. Senate's Levin-Coburn Subcommittee ("Levin-Coburn Report") (id. ¶¶ 25-80), a complaint filed by the Department of Justice against Deutsche Bank (id. ¶¶ 81-129), and a complaint filed by the Federal Housing Finance Agency ("FHFA") (id. ¶¶ 130-138).[1]

---

[1] On June 21, 2011, various investment funds commenced this putative class action was against Deutsche Bank AG and four individuals alleging violations of  various provisions of the Securities Exchange Act of 1934.  (Compl., ECF No. 1.)  On December 5, 2011, Building Trade United Pension Trust Fund, the Steward Global Equity Income Fund and the Seward International Enhanced Index

In response, defendants assert that plaintiffs' allegations of a "scheme" are an afterthought, that the numerous statements that individuals within Deutsche Bank are alleged to have made are merely subjective opinion, accurate statements of past performance, or non-actionable statements of corporate optimism. They argue that even if such statements were actionable, they were not made with requisite scienter, the individual defendants were not the "makers" of any actionable statements, and that plaintiffs fail to allege loss causation. In short, they move to dismiss the entirety of the amended complaint as having insufficient factual allegations to support a claim. This Court disagrees.

For the reasons set forth below, the Amended Complaint states claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act as to all defendants but one. The motion to dismiss is, therefore, DENIED, except as to defendant Börsig.

## I.  ALLEGATIONS IN THE AMENDED COMPLAINT

The Amended Complaint contains the following allegations, taken as true for purposes of this motion.

---

Fund ("the Funds") were appointed lead plaintiffs and the firm of Robbins Gellar Rudman & Dowd LLP was appointed lead counsel. (Mem. & Order, ECF No. 18.) The parties then stipulated that plaintiffs could wait to file an amended complaint until two weeks following the filing of an anticipated amended complaint in United States v. Deutsche Bank AG, No. 11 Civ. 2976 (S.D.N.Y. filed May 3, 2011). (Stipulation & Order, ECF No. 21.) Plaintiffs filed an Amended Complaint on June 1, 2012. (Am. Compl., ECF No. 23.) Defendants moved to dismiss on July 23, 2012. (Mot. Dismiss, ECF No. 24.) That motion became fully briefed on October 9, 2012. (Reply Mem. Supp. Mot. Dismiss, ECF No. 30.) The case was transferred to the undersigned on November 9, 2012. (Notice of Reassignment, ECF No. 32.)

Plaintiffs are purchasers of shares of Deutsche Bank stock during the period from January 3, 2007, through January 16, 2009.[2]  In the third paragraph of the Amended Complaint — stated clearly and prominently — plaintiffs assert that defendants engaged in a scheme to maximize profits at the expense of investors by originating and acquiring fraudulent and misrepresented RMBS.  (Am. Compl. ¶ 3, ECF No. 23.)  An RMBS is "a type of bond in which investors acquire an interest in the principal and interest payments generated by the underlying pool of residential mortgages."  (Id.)  Each RMBS is divided into tranches, or levels of seniority, with the more senior having less risk (because they are paid first) than the more junior (Id.)  All levels bear some risk that none of the tranches may be paid in the event of a default.

In addition, "[t]he most risky portions or interest in the various RMBS were rebundled into yet another security called a Collateralized Debt Obligation ("CDO"), and then resold to other investors."  (Id.)  Plaintiffs assert that the substantial profits defendants stood to make by packaging and selling RMBS and CDOs motivated them to conceal risks associated with the poor quality of the underlying mortgages.  (Id. ¶ 4.)  In addition, Deutsche Bank pursued the CDO market despite its growing awareness and knowledge of its riskiness, in order to protect investment bank fees, prestige, and to preserve the CDO jobs involved.  (Id. ¶ 42.)  The head of

---

[2] In Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869, 2888 (2010), the Supreme Court held that the securities laws only apply to securities transactions that take place in the United States or on domestic exchanges.  See also Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60 (2d Cir. 2012).  Accordingly, to the extent the Amended Complaint purports to include claims by class members who acquired shares in Deutsche Bank outside of the United States, such claims are dismissed.  This action shall proceed with respect only as to those who engaged in domestic securities transactions.

Deutsche Bank's CDO Group stated that the bank's fees translated into about $5-10 million per CDO.  (Id. ¶ 44.)  The same individual stated that new CDO deals had to be continuously completed in order to produce revenues the support the budgets of the CDO desks and departments involved in their creation.  (Id.)

According to plaintiffs, defendants' fraudulent scheme had four parts: (1) Deutsche Bank structured and marketed to unknowing third parties RMBS that it knew were poor quality; (2) defendants misrepresented Deutsche Bank's risk management practices; (3) defendants concealed Deutsche Bank's failure to write down impaired securities containing mortgage-related debt; and (4) that Deutsche Bank, along with a subsidiary it acquired for mortgage origination, "intentionally disregarded findings that residential mortgage loans did not comply with underwriting standards."  (Id. ¶ 6.)

Plaintiffs also assert that information set forth in the Levin-Coburn Report and the DOJ's complaint reveal that Deutsche Bank knew or should have known of a host of problems with the RMBS it was marketing, and that their public statements regarding risk management practices were wrong.   According to plaintiffs, based on this information, some of which is alleged to have been acquired before the class period commenced and other information was acquired during the class period, defendants made a variety of omissions and misstatements in furtherance of their alleged scheme.

In particular, plaintiffs assert that a variety of internal communications demonstrate that Deutsche Bank's top global RMBS trader, Greg Lippmann,

warned Deutsche Bank officers and employees that RMBS it was marketing were "crap." (Id. ¶¶ 26-27.)  In fact, Lippmann bet against mortgage-related securities by taking a short position in the billions of dollars.  (Id. ¶ 27.)  Plaintiffs specifically allege that at least some of the RMBS securities Lippmann was discussing were issued by or associated with Deutsche Bank.  (Id. ¶ 29.)  In the fall of 2005, Lippmann requested and received permission from his supervisor at Deutsche Bank, the Global Head of its Structured Products Group, to enter into credit default swap ("CDS") arrangements in the amount of $1 billion to short RMBS.  (Id. ¶ 34.) He made a presentation in which he described a negative view of the subprime market and that $440 billion in subprime mortgages would experience payment shocks in the next three years.  (Id.)  He also noted that because of the strong negative correlation between home price appreciation and loss severity, if home-price appreciation rates slowed, default and severity ratios might increase substantially in certain geographies.  (Id.)  Because Lippmann's position was so large, his supervisor required him also to obtain authorization from Rajeev Misra, Deutsche Bank's Global Head of Credit Trading, Securitization and Commodities. (Id. ¶ 35.)  Misra approved Lippmann's position.

The Amended Complaint alleges that throughout 2006, Lippmann's large position betting against RMBS grew — and with its growing size, it gained significant additional attention within Deutsche Bank.  (Id. ¶ 36.)  The size of Lippmann's position eventually reached $2 billion.

At the same time that Lippmann was building his short position on the bet that the price and performance of CDO's would decline, Deutsche Bank continued to structure and market CDOs.  (Id. ¶ 43.)  In order to increase sales of CDO inventory, CDOs were repackaged into other CDOs — something a Deutsche Bank managing director described as a "CDO2 balance sheet dump."  (Id. ¶ 46.)  In addition, Deutsche Bank turned increasingly to non-U.S. investors to buy CDOs. (Id. ¶ 47.)  In late 2006, Lippmann described the process of structuring and selling CDOs as a "ponzi scheme."  (Id. ¶ 48.)

In February and March 2007, sales of CDOs were slowing; in March 2007, Deutsche Bank structured and marketed a $1.1 billion CDO called "Gemstone 7." (Id. ¶ 50.)  While the top three tranches of those securities started out rated AAA, by November of 2007 they began to be downgraded — and were eventually downgraded to junk status.  (Id. ¶ 50.)  Prior to the issuance of Gemstone 7, the Deutsche Bank's CDO Group prepared a credit report for Deutsche Bank's internal credit-risk management group as part of the process of obtaining approval for Gemstone 7.  (Id. ¶ 51.)  Gemstone 7 was described, inter alia, as having "significant vintage risk"; those risks were not described in the Gemstone 7 offering materials. (Id.)  Many of the assets that went into Gemstone 7 were from Deutsche Bank's own inventory; Lippmann described these assets to colleagues and clients as "crap."  (Id. ¶ 52.)  Within days of sending an email in which he discussed some of the assets as "weak[]" and "performing poorly with substantial delinquencies," they were included in Gemstone 7 and marketed to investors.  (Id. ¶¶ 53, 54.)  Lippmann and

a trader discussed Deutsche Bank's inventory that was included in Gemstone 7, stating: "DOE[SN'T] THIS DEAL BLOW." (Id. ¶ 59.)  In January 2007, Deutsche Bank began to market Gemstone 7 aggressively.  (Id. ¶ 64.)  Aware that the market for CDOs was deteriorating, personnel within Deutsche Bank worked to accelerate sales.  (Id. ¶ 65.)  Two high-level employees discussed trying to sell Gemstone 7 "while we still can"; one stated: "Keep your fingers crossed but I think we will be price this just before the market falls off a cliff." (Id. ¶ 67.)

In a series of emails regarding other assets included in Deutsche Bank CDOs, Lippmann similarly described them as already risky, "generally horrible," agreeing that they were "crap" and that they "stink[]." (Id. ¶¶ 56-58.)  In late 2006 and early 2007, Lippmann's short position began to gain in value — further capturing internal attention.  (Id. ¶ 38.)  In January 2007, Lippmann met with Anshu Jain, Deutsche Bank's Head of Global Markets along with Misra and D'Albert to discuss his short position; following the discussion they concluded that he should maintain his position.  (Id.)  In February 2007, Jain again met with Lippmann to discuss his short position; at this time, sub-prime delinquencies were occurring at record rates. In February or early March, Jain also participated in a meeting with Deutsche Bank's executive committee, including its Management Board.  (Id. ¶ 39.) Lippmann was invited to attend. (Id.)  At this time, Lippmann's short position was approximately $4-5 billion.  (Id.)  At the same time, Deutsche Bank's mortgage group also held $102 billion in long RMBS and CDO securities; a Deutsche Bank hedge fund affiliate, Winchester Capital, held a net long position of $8.9 billion. (Id.)

The meeting ended with the decision that all parties would maintain their positions unchanged, including Lippmann.  (<u>Id.</u>)

In July 2007, major credit rating agencies began issuing downgrades of RMBS.  (<u>Id.</u> ¶ 41.)  By the end of the summer, Deutsche Bank initiated efforts to sell off its long positions. (<u>Id.</u>)  At the direction of senior management, Lippmann gradually began to cash in his short position, obtaining a return of $1.5 billion.  (<u>Id.</u>)  According to Lippmann, this was the largest profit Deutsche Bank had ever obtained from a single short position. (<u>Id.</u>)

Plaintiffs allege that there is evidence that Deutsche Bank "deliberately misled CDO investors in order to offload overpriced CDO securities."  (<u>Id.</u> ¶ 69.) For instance, when some potential investors inquired about the mark-to-market ("MTM") value of Gemstone 7's underlying assets, they were not provided the lower valuation marks prepared by Deutsche Bank itself. (<u>Id.</u> ¶¶ 69-72.)  When one Deutsche Bank employee asked why they could not show their own marks he was told that they were "too low."  (<u>Id.</u> ¶ 73.)

Between December 2006 and December 2007, Deutsche Bank issued 15 new CDOs worth approximately $11.5 billion. (<u>Id.</u> ¶ 76.)  It underwrote a CDO for Magnetar Capital ("Magnetar") and served as trustee for two other Magnetar CDOs; Magnetar's strategy (of which Deutsche Bank was aware) was to purchase the riskiest tranche of the CDO (the equity) and also take short positions on the other tranches of the same CDOs.  (<u>Id.</u> ¶ 76.)  Plaintiffs allege that Magnetar worked with financial institutions, including Deutsche Bank, to structure risky

CDOs; "Magnetar would receive a substantial payment from its short positions if the securities lost value." (Id. ¶ 76.) Deutsche Bank also worked with Elliot Advisors, and Paulson & Co., two hedge funds, that also bought the equity tranche and shorted the remainder; Deutsche Bank "sold the rest of the securities." (Id. ¶ 78.) Plaintiffs assert that there are repeated instances in which Deutsche Bank sold investors CDO securities while its own employee, Lippmann, was shorting some of the same assets, and while it was working with other hedge funds to short the same assets. (See, e.g., id. ¶¶ 75-80.)

In order to obtain the mortgage inventory that went into the CDOs it structured and sold, Deutsche Bank and a subsidiary it acquired in 2007, MortgageIT, generated many federally guaranteed mortgages quickly. (Id. ¶ 83.) Deutsche Bank qualified as a "Direct Endorsement Lender"; such lenders are required to certify that they comply with certain Federal Housing Authority ("FHA") quality control plans with respect to underwriting. (Id. ¶ 82.) Plaintiffs allege that in pursuit of mortgage inventory, Deutsche Bank and MortgageIT failed to audit early payment defaults, to appropriately staff or perform quality control, to address dysfunctions within the quality control system about which senior management had been informed, and that they ignored (by never opening the envelopes) findings of control lapses by outside auditors. (Id. ¶ 84.) Following the housing market crash, the federal government had to pay hundreds of millions of dollars in insurance claims and related costs arising out of MortgageIT's approval of mortgages for FHA insurance. (Id. ¶ 86.)

10

Plaintiffs allege that the acquisition of MortgageIT was part of the overall scheme to mislead investors: MortgageIT engaged in risky loans which were then included in Deutsche Bank CDOs.  (See, e.g., id. ¶¶ 90-99.)  Deutsche Bank even had a Credit Risk Committee and a Quality Control Committee — both of which plaintiffs allege did not perform their jobs adequately.  (See, e.g., id. ¶¶ 90-107.)  Plaintiffs allege that "[c]ontrary to Deutsche Bank's representations to HUD, MortgageIT was not doing the required quality control reviews after January 2007.  And, by the end of 2007, MortgageIT was not reviewing early payment defaults on closed FHA-insured loans.  This failure to conduct the requisite quality control reviews resulted in an explosion of early payment defaults."  (Id. ¶ 127.)

On May 10, 2012, Deutsche Bank and three of its subsidiaries, including MortgageIT, entered into a settlement agreement with the U.S. Department of Justice.  The settlement required Deutsche Bank to pay $202.3 million.  In the stipulation of settlement, Deutsche Bank admitted that the Deutsche Bank defendants "were in a position to know that the operations of MortgageIT did not conform fully to all of HUD-FHA's regulations, policies, and handbooks; [and] that one or more of the annual certifications was signed by an individual who was also an officer of certain of the [Deutsche Bank] Defendants."  (Id. ¶ 129.)

Deutsche Bank was also sued by the Federal Housing Finance Authority in September 2011.  (Id. ¶ 130.)  "According to the FHFA's investigation, Deutsche Bank had falsely represented that the underlying mortgages complied with the represented underwriting guidelines and had significantly overstated both the

value of the underlying property and the borrowers' ability to repay the mortgages, and had misrepresented the percentage of owner-occupied properties and the loan-to-value ratios." (<u>Id.</u> ¶ 130.)  Deutsche Bank had been paid over $14.2 billion for the misrepresented RMBS between September 2005 and June 29, 2007.  (<u>Id.</u>)  Plaintiffs allege that Deutsche Bank and its employees' "knowledge of the false and improper underwriting practices impacting its mortgages and RMBS is demonstrated by, <u>inter</u> <u>alia</u>, systemic misrepresentations of the loan characteristics of its RMBS"  and ignoring advisors who indicated that there was a failure to comply with underwriting standards.  (<u>Id.</u> ¶ 135.)

During the putative class period, January 3, 2007, to January 16, 2009, in connection with and in furtherance of their alleged fraudulent scheme, defendants are alleged to have made a number of false and misleading statements:

1.  A false statement in January 2007 relating to its acquisition of MortgageIT being accretive to earnings and to assist it in growing its business; according to plaintiffs defendants failed to disclose their knowledge of the widespread underwriting misconduct and poor quality mortgages; and that defendants knew or recklessly disregarded that many loans being issued would default.  (<u>Id.</u> ¶¶ 139-40.)

2.  On March 27, 2007, Deutsche Bank's SEC Form 20-F contained explicit statements regarding overall risk and capital management supervision; plaintiffs allege that these statements were misleading because they

failed to disclose and were inconsistent with the poor quality RMBS and CDO assets Deutsche Bank was then structuring and selling.  (<u>Id.</u> ¶ 141.)

3. On May 8, 2007, Deutsche Bank announced that because of market volatility, including as to MortgageIT and the sub-prime effects, it had decided to "tighten even further our credit standards."  Plaintiffs allege that these statements were misleading because they failed to disclose and were inconsistent with the poor quality RMBS and CDO assets that it was structuring and selling.  (<u>Id.</u> ¶ 143.)

4. On June 14, 2007, Bänziger of Deutsche Bank participated in a conference in which he "assured investors that Deutsche Bank employed '[p]rudent risk management' and '[h]igh underwriting standards'."  (<u>Id.</u> ¶ 144.) Plaintiffs allege that these statements were misleading because they failed to disclose and were inconsistent with the poor quality RMBS and CDO assets that it was structuring and selling.  (<u>Id.</u>)

5. On August 1, 2007, in connection with its second quarter results, Deutsche Bank again stated that it had consistently, and would continue to take a prudent approach to risk taking.  It stated "We firmly believe that these qualities will enable us to continue to perform strongly." Plaintiffs allege that these statements were misleading because they failed to disclose and were inconsistent with the poor quality RMBS and CDO assets that it was structuring and selling.  (<u>Id.</u> ¶ 145.)

13

6. On a conference call relating to the second quarter 2007 earnings, defendant Di Iorio stated that any sub-prime exposure that Deutsche Bank had at that time was relatively flat and that before it made any commitments, it went through a very thorough credit review.  Plaintiffs allege that these statements were misleading because they failed to disclose and were inconsistent with the poor quality RMBS and CDO assets that it was structuring and selling.  (Id. ¶ 146.)

7. On September 4, 2007, Ackerman of Deutsche Bank made a presentation that stated that the bank "is not exposed to further deterioration in the US sub-prime mortgages across its books" and "exposure to US mortgage originators [is] tightly managed and largely hedged."  He repeated these statements in presentations on September 10-14, 2007; Bänziger made a presentation on September 12, 2007 in which he made substantially the same statements. Plaintiffs allege that these statements were misleading because they failed to disclose and were inconsistent with the poor quality RMBS and CDO assets that it was structuring and selling.  (Id. ¶¶ 147-50.)

8. In February 7, 2008, Ackerman, Chairman of Deutsche Bank's Management Board, stated that "in the fourth quarter we again demonstrated the quality of our risk management. We had no net write-downs related to sub-prime, CDO or RMBS exposures."  Bänziger also touted the high quality of Deutsche Bank's loans and its high

underwriting standards.  Di Iorio also referred to strong risk management as supporting its results.  Plaintiffs allege that these statements were misleading because they failed to disclose and were inconsistent with the poor quality RMBS and CDO assets that it was structuring and selling. (Id. ¶¶ 153-55.)

9.  On March 26, 2008, Deutsche Bank filed it Form 20-F for its 4Q07 and FY07 results and stated: "We manage credit, market, liquidity, operational, business, legal and reputational risks as well as our capital in a coordinated manner at all relevant levels within our organization.  This also holds true for complex products . . . ."  (Id. ¶ 156.)  Plaintiffs allege that this Form 20-F concealed MortgageIT's violations of origination standards and the poor quality of mortgages and mortgage-backed assets. (Id. ¶ 158.)

10.  On April 1, 2008, Ackerman participated in a conference in which he assured investors that all CDOs were marked-to-market; the same presentation stated that Deutsche Bank's RMBS business was predominately AAA-rated securities based on Alt-A collateral.  According to plaintiffs, these statements were false and misleading since defendants knew that the assets were not properly marked-to-market and that the credit ratings were inaccurate or outdated.  (Id. ¶ 159.)

Later in April 2008, Deutsche Bank announced its first quarter 2008 results. In its press release, it announced its first loss in five years, headcount reductions

and attempts to reduce risk exposure.  (Id. ¶ 163.)  On July 31, 2008, Deutsche Bank released its second quarter 2008 results, including a second loss and a $3.6 billion write-down of the value of RMBS.  (Id. ¶ 164.)  Over the course of the next few months, Deutsche Bank experienced additional losses, financial difficulties and took additional write-downs that it attributed in part to sub-prime and RMBS-related losses.  (Id. ¶¶ 167-69.)  In December 2008, just under two years after its acquisition, Deutsche Bank decided to close MortgageIT.  (Id. ¶ 171.)  Throughout this period, Deutsche Bank's stock was declining — from a class period high of $159.59 to $21.27 on January 20, 2009.  (Id. ¶ 173.)

Plaintiffs have brought this suit against Deutsche Bank along with four individual defendants: Ackermann, CEO, Chairman of the Management Board and Chairman of the Group Executive Committee, at all relevant times; Börsig, Chairman of the Supervisory Board at all relevant times; Bänziger, a member of the Management Board, Chief Risk Officer and member of the Group Executive Committee, at all relevant times, and Di Iorio, a member of the Management Board, Chief Financial Officer, and a member of the Group Executive Committee, at all relevant times.  (Id. ¶¶ 19-22.)  Plaintiffs assert two causes of action: a claim for violation of Section 10(b) of the 1934 Act and Rule 10b-5 against all defendants (Count I), and a claim for violation of Section 20(a) of the 1934 Act against all defendants (Count II).

## II.   LEGAL STANDARD FOR A 12(b)(6) MOTION

On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations, <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678-79 (2009), and draws all reasonable inferences in plaintiffs' favor.  <u>See</u> <u>Famous Horse Inc. v. 5th Ave. Photo Inc.</u>, 624 F.3d 106, 108 (2d Cir. 2010).  To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  <u>Id.</u>  Thus, while "Rule 8 marks a notable and generous departure from hyper-technical, code-pleading regime of a prior era, [ ] it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  <u>Id.</u> at 678-79.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not shown — that the pleader is entitled to relief."  <u>Id.</u> (internal punctuation omitted); <u>see also</u> Fed. R. Civ. P. 8(a)(2).

## III.   LEGAL STANDARD FOR 10(b) CLAIMS

Most claims for violations of Section 10(b) of the 1934 Act are based upon alleged material misstatements or omissions upon which plaintiffs relied in connection with securities transactions.  That, in effect, is the classic case.  However, the reach of Section 10b is not so limited.  Though much less frequently pled in this manner, plaintiffs may bring claims that a particular scheme, or course of conduct was itself fraudulent.  <u>See</u> 15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5(a)-(c).

This effectively allows plaintiffs to allege a fraudulent scheme without being tethered to whether specific statements were themselves material misstatements or omissions; such statements may simply be part of the fabric of the fraudulent scheme alleged.

Here, plaintiffs have clearly alleged both a scheme to defraud and particular misstatements and omissions. (See, e.g., Am. Compl. ¶¶ 3, 12, 24, 139-159, 184.)  To state a claim under Rule 10b-5, plaintiffs must plead plausible facts that defendants employed a device, scheme and artifice to defraud, or that defendants made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs in connection with their purchase of securities. 17 C.F.R. § 240.10b-5.

Understanding the breadth of the 10(b) statutory scheme is of particular relevance when arguments are made that isolated statements may or may not themselves be actionable.   Alleging a fraudulent scheme has significant legal relevance to whether claims withstand initial scrutiny as to individual defendants who may not be alleged to have "made" actionable misstatements, but may nonetheless be alleged to be "actors" in a scheme.  In this regard, whether a claim has been properly pled as to an individual may be based either on plausible facts that he "made" a misstatement or that he participated in a fraudulent scheme.

Under either scenario, to state any type of 10(b) claim, a plaintiff must allege plausible facts suggesting that the actionable misconduct was made with requisite scienter.  See In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 491  (S.D.N.Y. 2005).  The Private Securities Litigation Reform Act ("PSLRA") requires that claims must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2).  The required state of mind is an intent to deceive, manipulate or defraud.  See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976); Ganino v. Citizens Utilities Co., 228 F.3d 154, 168 (2d Cir. 2000); In re Parmalat, 376 F. Supp. 2d at 491.

### a. **Misstatement or Omission**

Here, plaintiffs assert both actionable misstatements/omissions and a scheme.  To find that a 10b-5 claim has been stated based upon an actionable misstatement or omission, plaintiffs must allege as to each defendant plausible facts that: (1) the particular defendant made a misstatement or omission of material fact[3] (or in the case of an omission, failed to make a required statement); (2) that the particular defendant did so with the requisite scienter — or culpable state of mind; (3) that one or more plaintiffs relied upon such misstatement or omission, (4) in connection with a U.S. securities transaction, (5) and that such reliance was the proximate cause of a plaintiff's loss.[4]  See Lentell v. Merrill Lynch & Co., 396 F.3d

---

[3] In Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011), the Supreme Court stated that for Rule 10b-5, the "maker" of a statement is the person or entity with ultimate control over the statement, including its content and whether and how to communicate it.
[4] Defendants do not challenge the reliance element of the 10b-5 claim outside the context of materiality, and, accordingly, the Court will not discuss it outside that context.

161, 172 (2d Cir. 2005); In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998); In re Parmalat, 376 F. Supp. 2d 472, 491 (S.D.N.Y. 2005).

Claims of actionable misstatements or omissions sound in fraud.  As a result, to pass muster, allegations supporting such claims must meet the requirements of both Rule 9(b) of the Federal Rules for Civil Procedure and the PSLRA.  See Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).  This pleading standard requires that a plaintiff state with particularity, as to each defendant, (1) the particular statement that the plaintiff asserts were fraudulent, (2) the maker of the statement(s), (3) where and when the statement was made, and (4) why the statement(s) was fraudulent.  15 U.S.C. § 78u-4(b)(1); see also Novak, 216 F.3d at 306; In re Parmalat, 376 F. Supp. at 491.

### b.  Materiality

An actionable misstatement is not simply one that is false or incomplete; there must be a substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction.  See Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988); Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994); In re Espeed, Inc., Sec. Litig., 457 F. Supp. 2d 266, 279 (S.D.N.Y. 2006).

The question of materiality is often fact specific; but certain types of statements have been found immaterial as a matter of law.  In a number of cases, "rosy affirmations" or statements that are loosely optimistic regarding a company's

well-being have been found to be too vague and general to be actionable.  See, e.g., Novak, 216 F.3d at 315; ("[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient . . . ."); Rombach, 355 F.3d 164, 174 (2d Cir. 2004) (unfocused expressions of puffery and corporate optimism not actionable); but see Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 184-85, 191 (S.D.N.Y. 2010) (declining to dismiss on materiality grounds defendants' alleged statements that (1) loans met "extremely conservative lending standards" when they did not and (2) defendants maintained a "disciplined focus" when there was claimed to be a "glaring disparity" between statements and operations); In re CIT Grp. Inc. Sec. Litig., 08 Civ. 6613, 2010 WL 2365846, at *3 (S.D.N.Y. June 10, 2010) (citing In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010)) (holding defendants' representations of conservative lending standards to be actionable in light of their failure to disclose the lowering of those standards).

Many types of forward looking projections surrounded by adequate cautionary language have also been deemed not actionable as a matter of law.  See, e.g., Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002).  The law on such optimistic statements surrounded by cautionary language has developed into what is known as the "bespeaks caution" doctrine.  This doctrine is limited to forward looking statements and does not apply to historical or present facts.  See P. Stolz Family P'ship v. Daum, 355 F.3d 92, 96-97 (2d Cir. 2004).  If defendants assert that cautionary language renders a forward looking statement not actionable, the

Court will examine whether that language addressed the specific contingency at the core of the alleged misrepresentation.  See id. at 118.   Where the cautionary language is adequate, a reasonable investor would not be deemed to consider the statement material.

In City of Omaha, upon which defendants here place heavy reliance, plaintiffs' allegations spanned seventy-seven pages and contained numerous allegations that revenue and asset value was overstated.  See City of Omaha v. CBS Corp., 679 F.3d 64, 66 (2012).  Following a public announcement by CBS that it would conduct an impairment test, its stock fell and it was sued for securities fraud in connection with its prior statements.  The Second Circuit held that the alleged misstatements were not of material fact, but rather of opinion.  Id. at 67-68.  The Court found that the allegations were of general deterioration in financial condition but that this did not "mandate[]" that impairment testing be performed at the particular time plaintiffs asserted.  Id. at 68.  The Court found that the complaint contained only conclusory allegations that defendants had knowledge of events or circumstances which would have mandated such testing.  Id.  Further, the Court found that the complaint was devoid of anything more than conclusory allegations that plaintiffs did not believe in the optimistic views and business outlook expressed.  Id.  Plaintiffs there conceded at oral argument that all of the alleged "red flags" were public knowledge.  Id. at 69.  Accordingly, the market price could not have been inflated; and there could not have been actionable reliance on a fraudulently inflated stock price.  Id.

Both City of Omaha, and the Second Circuit's earlier ruling in Fait v. Regions Financial Corp., 655 F.3d 105 (2d Cir. 2011), have been interpreted as affirming that estimates of loan loss reserves and good will are statements of opinion and not fact; and that for valuation type statements to be actionable, there must be some allegation that the maker of the statement did not believe the statement at the time it was made.  See In re Deutsche Bank AG Sec. Litig., No. 09 Civ. 1714, 2012 WL 3297730, at *1 (S.D.N.Y. Aug. 10, 2012); In re Gen. Elec. Co. Sec. Litig., 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012) (referring to Fait for the proposition that for a statement of belief or opinion to give rise to liability it must be both objectively false and disbelieved at the time it was made).

### c.  **Fraudulent or Deceptive Schemes**

To state a claim that a defendant has engaged in a fraudulent or deceptive scheme in violation of Rule 10b-5(a) and (c), a plaintiff must allege a defendant (1) committed a deceptive or manipulative act, (2) with the requisite scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendant's actions caused the plaintiff's injuries.  See In re Parmalat, 376 F. Supp. 2d at 492; In re Global Crossing Ltd. Sec. Litig., 322 F. Supp. 2d 319, 329 (S.D.N.Y. 2004); In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 385 (S.D.N.Y. 2003).

Unlike actionable misstatements or omissions, claims that liability is premised on a fraudulent or deceptive scheme do not require compliance with the PSLRA's pleading requirements.  See e.g. In re Parmalat, 376 F. Supp. 2d at 492;

23

see also Shields, 25 F.3d at 1128.  Such claims do sound in fraud, however, and plaintiffs must meet the strict pleading requirements of Rule 9(b).  Id.  To meet the Rule 9(b) requirements for a claim of market manipulation, a plaintiff must allege specific facts regarding what manipulative acts were performed, which defendant(s) performed them, when they were performed, and what the effect of the alleged scheme was on the securities.  See Global Crossing, 322 F. Supp. 2d at 329; In re Blech Sec. Litig., 961 F. Supp. 569, 580 (S.D.N.Y. 1997).  One can be held liable in connection with such a scheme even if he did not himself make a material misstatement in connection with it.  See, e.g., In re Parmalat, 376 F. Supp. 2d at 502; In re Lernout & Hauspie Sec. Litig., 236 F. Supp. 2d 161 (D. Mass. 2003).

### d. Scienter

Scienter is the mental state embracing an intent to deceive, manipulate or defraud. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319, 323 (2007). When deciding a motion pursuant to Rule 12(b)(6), a court must decide whether all facts taken together — that is, collectively — give rise to a strong inference of scienter.  Id. at 323.  This is not whether any individualized statement in isolation meets that standard.  Id.

Facts giving rise to a strong inference of scienter can be alleged by pleading (1) motive and opportunity to commit the fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.  Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); accord Novak, 216 F.3d at 311.  Motive and opportunity require plausible allegations of concrete benefits that could be realized by the

misstatement, and the likely prospect of achieving such benefits.  See Shields, 25 F.3d at 1130.  Allegations limited to the type of "corporate profit" motive possessed by most corporate directors and officers do not suffice.  See Kalnit, 264 F.3d at 139.

Assertions of conscious misbehavior or recklessness can satisfy the scienter requirement.  Conscious misbehavior generally consists of deliberate, illegal behavior.  Novak, 216 F.3d at 308.  Recklessness requires allegations that a defendant's conduct was highly unreasonable and constituted an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.  See Rothman, 220 F.3d at 90; Novak 216 F.3d at 308; Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (recklessness can be found in instances of egregious refusal to see the obvious or investigate the doubtful).  Plausible allegations that a defendant had facts at his disposal contradicting material public statements, but ignored such facts or proceeded despite them, can be sufficient to plead recklessness.  See Novak, 216 F.3d at 308; see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196-97 (2d Cir. 2008) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

"The Second Circuit has explicitly recognized that plaintiffs may rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period."  Lapin v. Goldman Sachs Grp., Inc., 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006); Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d at 183-84;

see also In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 158, 181 (S.D.N.Y. 2003) (post-class period articles can be used to establish awareness of falsity of class period statements because the opposite result would reward defendant for successful concealment).  Allegations in a complaint, including knowledge which the defendants knew or should have known, should be viewed together.  See Freudenberg, 712 F. Supp. 2d at 197-98.  In Freudenberg, allegations of scienter were based, in part, on claims that management had been specifically informed of certain deficiencies in pricing and loan losses.  Id. at 198-99.  (There, among the findings, but not essential to the court's decision, was that defendants has also engaged in stock sales.  Id. at 200.)

In the context of a 12(b)(6) motion, a court must balance reasonable inferences favoring the plaintiffs against those favoring a particular defendant.  See Tellabs, 551 U.S. at 323-24.

### e.  **Causation**

Pleading loss causation is an essential element of a claim — but is not meant to impose a great burden on plaintiffs.  See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346 (2005).  There is no heightened standard for pleading loss causation.  See In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008). A short, plain statement that provides defendants with notice of the loss and some notion of the causal connection to the alleged misconduct is sufficient.  Dura, 544 U.S. at 346-47.  To accomplish this, plaintiffs must assert that they relied upon a scheme, or a defendant's alleged misstatement/omission, in connection with a

securities transaction and that such reliance caused at least part of their losses.

See Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir. 2001).

## IV.   LEGAL STANDARD FOR CONTROL PERSON LIABILITY

Section 20(a) of the 1934 Act imposes liability on "control persons."  Although a defendant may not be held liable both for a primary violation of the 1934 Act under Section 10(b) as well as a violation pursuant to Section 20(a), alternative theories are allowed at the pleading stage.  Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 241 (S.D.N.Y. 2009).

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To sustain a claim of control person liability under Section 20(a), plaintiffs must allege plausible facts that (1) there was a primary violation by a controlled person, (2) the defendant controlled the primary violator, (3) the defendant who is alleged to be the controlling person was, in some sense, a culpable participant in the controlled person's fraud.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).  Thus, plaintiffs must allege sufficient plausible facts of a controlling person's misbehavior or recklessness.  In re CIT Grp. Sec. Litig., 2010 WL 2365846, at * 5.

## V.     DISCUSSION

### a. **Deutsche Bank**

Plaintiffs allege that defendants engaged in a scheme to defraud investors by increasing short term revenues and inflating Deutsche Bank's stock price by taking mortgages of substandard quality and pooling them into RMBS and CDOs.  Those RMBS and CDOs were then sold to investors — generating short term profits, which, in turn, made the stock more attractive.  Plaintiffs allege that defendants had specific knowledge of the poor quality of the mortgages underlying the RMBS and CDOs — and that they demonstrated this knowledge by authorizing Lippmann to take and expand a multi-billion dollar short position on RMBS and CDOs (some number of which were structured and sold by Deutsche Bank).  This short position only made sense — and only made money — as the value of the RMBS and CDOs declined.  According to plaintiffs, defendants asked Lippmann to provide specific information supporting this short position (that is, why he expected CDOs to decline in value), and such information was provided.  In addition, plaintiffs allege that despite knowing that MortgageIT was engaged in poor lending practices (which were packaged into RMBS and CDOs) they nonetheless repeatedly reassured investors that their credit and lending practices were conservative and being adhered to.  According to plaintiffs, investors were misled by the scheme, misled by the specific misstatements and omissions, relied upon the total picture presented to them, and engaged in purchases of Deutsche Bank securities, causing loss.

Plaintiffs have certainly set forth sufficient plausible allegations to support a claim for a fraudulent scheme against Deutsche Bank.  The scheme is laid out with specificity.  There is no doubt that the scheme related to material aspects of the bank's operations.  Scienter is adequately pled by multiple references to information available to senior management, specific questions asked by, and presentations made to senior management, all of which contradicted the public-facing statements regarding the value of CDOs Deutsche Bank continued to structure, price and market as the walls closed in.  At the very least, the fact that information existed and was presented disproving the validity of the public statements made by Deutsche Bank supports plausible allegations of recklessness.

Defendants argue that the alleged misstatements and omissions are merely non actionable statements of opinion — akin to the situations discussed in <u>Fait</u> and <u>City of Omaha</u>.  This Court disagrees.

Here, plaintiffs allege that, at very time the market was beginning to experience the early effects of the sub-prime implosion, Deutsche Bank made statements that it had acted conservatively with respect to risk and that it had adhered to conservative lending standards.  Plaintiffs allege that at the time of these statements, the same individuals who had made the statements had been provided information indicating the opposite.  These allegations present different facts from those in <u>City of Omaha</u> or <u>Fait</u> — and present facts supportive of both objective and subjective falsity.  Whether or not discovery will prove or disprove

these allegations is not for this Court at this time.  This action may proceed as against Deutsche Bank.

### b. <u>The Individual Defendants</u>

This Court is required to analyze each defendant separately — to determine whether there are sufficient plausible allegations to support the two causes of action as to a defendant.  Here, plaintiffs have alleged that four individuals are liable for violations of Sections 10(b) and 20(a) of the 1934 Act.

First, the Court asks whether there each defendant is alleged to have been engaged in a fraudulent scheme, and/or to have made a material misstatement or omission.  Defendants correctly point out that defendant Börsig is not alleged to have actually made a single misstatement.  The others are alleged to have made or participated in making misstatements (for instance, Ackermann is alleged to have made statements referred to in paragraphs 145, 147, 148, 152, 153, 159, 164 of the Amended Complaint; Di Iorio is alleged to have made statements referred to in paragraphs 143, 146, 155; Bänziger is alleged to have made the statement referred to in paragraphs 144, 149, 154).  Defendant Börsig's name is not specifically mentioned in connection with particular misstatements and omissions, but he is alleged to have been Chairman of the Supervisory Board of Deutsche Bank at all relevant times.  However, there are no specific allegations regarding the involvement of the Supervisory Board in making any of the alleged misstatements. As a result, there are sufficient allegations of material misstatements against only three of the four defendants: Ackerman, Bänziger and Di Iorio.

The Court then asks whether there are sufficient allegations to support a claim that Börsig and the other defendants participated in an unlawful scheme. Here, the fact that three of the four defendants are alleged to have made statements in furtherance of the scheme — and that the statements were part of the scheme — is sufficient as to them.  In addition, the same three individual defendants are alleged to be on both the Deutsche Bank Management Board and to be part of its Group Executive Committee.  (See, e.g., Am. Compl. ¶¶ 19, 21, 22, ECF No. 23).  In addition, Lippmann is alleged to have met with some members of the Executive Committee to get authorization for his short position.  (Id. ¶¶ 38, 39.)  Börsig's involvement is derivative — and based on his position as Chairman of the Supervisory Board.  In paragraph 141, the Amended Complaint refers to the conclusory statement in the March 27, 2007, Form 20-F that the "Management Board provides overall risk and capital management supervision . . . [, and the] Supervisory Board regularly monitors our risk and capital profile."  (Id. ¶ 141.)  A similar statement is made the following year.  (Id. ¶ 156.)  These allegations are insufficient to support a claim that Börsig — not alleged to have made any statements — can be liable as a participant in a fraudulent scheme.  There are no specific allegations that, apart from misstatements, the Supervisory Board played any real role in the scheme itself.  As to Börsig, there is "no there there," and on this basis, the claims against Börsig fail and are dismissed.

The Court next inquires as to whether there are sufficient allegations of scienter as to the three remaining individual defendants — and finds that there are.

There are allegations, referred to above, in which Deutsche Bank is alleged to be engaged in originating mortgages, structuring and selling RMBS and CDOs — while at the same time knowing that these assets were far riskier than an investor might reasonably suppose.  There are specific allegations that Lippmann made presentations to the Executive Committee, of which these three individuals were members, that supported his view that a multi-billion dollar bet against CDOs was appropriate.  Such allegations of specific information, that contradicted these same individual's public statements, support a strong inference of scienter.  Those same allegations support an inference that these statements were both objectively false when they were made, and made with sufficient knowledge or reckless as to meet a requirement for subjective falsity as well.[5]

Plaintiffs adequately allege causation.  Their complaint includes statements taken from Deutsche Bank's own 2008 Annual Report attributing net losses in part to "mark-downs relating to . . . provisions against residential mortgage-backed securities."  (Id. ¶ 174.)  It also alleges a total of $4.5 billion in residential mortgage–related losses in 2007 and 2008, which, plaintiffs argue, contributed to an eighty-six percent decline in the share price of Deutsche Bank's stock.  (Id. ¶¶ 180-81.)  These allegations give defendants ample notice of the causal connection alleged between the fraudulent conduct and economic loss upon which plaintiffs sue.

---

[5] Defendants urge that the fact that the Amended Complaint concedes that Deutsche Bank maintained a long position means that there could not be scienter.  This Court disagrees.  That people can bet in different directions does not mean that they necessarily disbelieve one position in favor or another; it simply means they are gamblers unwilling to place their entire bet on red, versus black.  The Amended Complaint plausibly suggests that they assured investors that their bets were in one direction — and omitted that they had taken bets in both directions.

### c. **Section 20(a): Control Person Liability**

Plaintiffs also adequately plead a claim pursuant to Section 20(a) for control person liability.  The Amended Complaint contains sufficient allegations to support a claim for a primary violation as to Deutsche Bank and the three individual defendants.  In addition, there are a number of specific allegations that these individuals were sufficiently direct participants in the alleged scheme, and in the management groups that allegedly participated in the scheme, to support control. For instance, each of three individuals was of the Executive Committee and Management Board; in addition, each held a significant and directly relevant management position: CEO (Ackermann), CFO (Di Iorio), and Chief Risk Officer (Bänziger).  The Section 20(a) claim has been adequately pled.

## VI.    CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the Amended Complaint is DENIED as to defendant Deutsche Bank and defendants Ackermann, Bänziger and Di Iorio.  It is GRANTED with respect to Börsig.

The PSLRA stay of discovery is hereby lifted.  In light of the length of time that has already passed, the parties are encouraged immediately to commence appropriate discovery.

The Court will hold an initial pre-trial conference on **April 16, 2013, at 1:00 p.m.**  The parties should refer to the Court's individual rules regarding matters to be addressed prior to and at that conference.

The Clerk of Court is directed to terminate the motion at ECF No. 24.

Dated:        New York, New York
              March 27, 2013

_____
                 Katherine B. Forrest
              United States District Judge