UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

IBEW LOCAL 90 PENSION FUND, on
behalf of itself and all others similarly
situated,

                      Plaintiffs,

             -v-

DEUTSCHE BANK AG, et al.,

                    Defendants.

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: OCT 2 9 2013

11 Civ. 4209 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On June 1, 2012, plaintiffs IBEW Local 90 Pension Fund ("IBEW"), on behalf of itself and all others similarly situated, filed this action against defendants Deutsche Bank AG ("DB"), Josef Ackermann ("Ackermann"), Clemens Börsig, Hugo Bänziger, and Anthony Di Iorio (collectively, "defendants").[1] This purported class action alleges violations of the securities laws based on alleged misstatements and omissions by DB and its subsidiaries in connection with the nature, level of exposure, and handling of risk in connection with certain residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs"). (See Amend. Compl. ¶ 3, dated June 1, 2012, ECF No. 23.)

According to plaintiffs, during the period from January 3, 2007 through January 16, 2009 (the "Class Period"), DB engaged in a fraudulent scheme to profit by originating and acquiring defective mortgages for securitization and re-securitization into its RMBS and CDOs and misrepresenting to investors its risk

---

[1] This matter was transferred to the undersigned on November 9, 2012.

management practices; plaintiffs also allege that DB concealed the failure to write down impaired mortgages. (See generally id. ¶¶ 3-9, 12.)

Plaintiffs have moved to certify a class and to include IBEW as a named plaintiff.[2] (See Pls.' Class Mot., dated July 1, 2013, ECF No. 51.) In support of their class certification motion, plaintiffs have submitted three declarations by Mark A. Marek. (See ECF Nos. 54, 70, 79.) The first two declarations set forth Marek's opinion that DB's shares traded in an efficient market (see ECF No. 54, 70); in Marek's third declaration, he opines that it is possible to calculate damages on a class-wide basis. (See ECF No. 79.)

Defendants oppose plaintiffs' motion to certify a class (see Defs.' Class Opp'n, dated August 29, 2013, ECF No. 57), and have moved to exclude the declaration and all expert testimony of Marek pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) (see Defs.' Mot. Preclude, dated Aug. 29, 2013, ECF No. 59). In support of their positions with respect to Marek, defendants have submitted declarations from Paul Gompers ("Gompers") and Joseph Grundfest ("Grundfest"). (See ECF Nos. 62, 63.) The key question is whether Marek's

---

[2] IBEW was the original named plaintiff in the first filed securities action in June 2011. (See Compl., dated June 21, 2011, ECF No. 1.) When the Amended Complaint was filed a year later, on June 1, 2012, IBEW was no longer a named plaintiff. (See Amend. Compl. ¶¶ 16-17.) The Amended Complaint named Building Trades United Pension Trust Fund ("Building Trades") and Steward Global Equity Income Fund ("Steward Global") and Steward International Enhanced Index Fund ("Steward International") (together, the "Steward Funds") as lead plaintiffs. (See id.) Regardless, since the Court declines to certify the class in this case, it need not address the issue of including IBEW now as a named plaintiff.

contention that DB's shares were traded in an efficient market should be given credence by this Court.[3]

On October 4, 2013, this Court held an evidentiary hearing at which all three experts testified and were cross-examined.[4]  Defendants' experts – both in their declarations and at the hearing – spent a significant amount of time on two issues:  first, that Germany was the dominant market for trading DB's global registered shares ("GRSs") and German pricing of the shares drove U.S. pricing (over 90% of DB GRSs traded in Germany during the Class Period); and second, the impact of the major financial crisis occurred in the U.S. and Europe during the Class Period, which resulted in restrictions on short sales of securities at various points.

---

[3] Proving market efficiency is fundamental to plaintiffs' claims.  In order to make out a claim under Section 10(b) of the Securities and Exchange Act of 1934, a plaintiff must prove, among other things, reliance upon a misrepresentation or omission by the defendant.  See Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, – U.S. – , 133 S. Ct. 1184, 1191-92 (2013) (citations omitted).  However, recognizing the difficulties of proving direct reliance, in Basic Inc. v. Levinson, 485 U.S. 224, 241 (1981), the Supreme Court "endorsed the 'fraud-on-the-market' theory, which permits certain Rule 10b-5 plaintiffs to invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public."  Amgen, 133 S.Ct. at 1192 (citing Basic, 485 U.S. at 241-49).  The fraud-on-the-market theory rests on the premise that "certain well developed markets are efficient processors of public information," and therefore the price of a security at any given time reflects the impoundment (or inclusion) of that information.  Id.
[4] The Court accepted the declarations submitted by the experts as their direct testimony; the opposing party was then provided an opportunity to cross-examine the proposed expert; the proffering party was then provided an opportunity for redirect.  (See ECF No. 83.)

For the reasons set forth below, the Court GRANTS defendant's motion to exclude Marek's declarations and testimony and DENIES plaintiffs' motion for class certification.

I.   Plaintiffs' Proposed Expert, Michael A. Marek

A.   Marek's Qualifications

Marek has provided declarations and testimony on behalf of plaintiffs in securities class action litigations, and specifically for plaintiffs' counsel, Robbins Geller Rudman & Dowd ("Robbins Geller"), for over 20 years.  (Tr. at 37-38; see also Memorandum of Law in Support of Defendants' Motion to Exclude the Declaration and All Expert Testimony of Michael A. Marek ("Defs.' Preclude Mem.") at 10, dated Aug. 29, 2013, ECF No. 60.)

Marek started his career in this area at Princeton Venture Research.  (Tr. at 37.)  From the fall of 1986 until December of 1997, Marek worked behind the scenes, assisting John Torkelson in the preparation of declarations signed and submitted by Torkelson in various securities class action litigations.  (Id. at 37.)  Torkelson's career ended when he pled guilty and went to jail for submitting false declarations and taking secret success payments in connection with securities class actions in which he provided declarations.  (Id. at 37; Defs.' Preclude Mem. at 10.)[5]

---

[5] At his deposition, defendants' counsel asked Marek a series of questions concerning whether he had worked on certain cases (which, though not revealed to Marek at his deposition, were involved in Torkelson's unlawful activities).  (See Marek Dep. at 59; Defs.' Preclude Mem. at 10.)  Marek stated that he did not recall whether he had worked on each case.  (See Marek Dep. at 59.)  At the hearing, Marek flatly stated that he did not work on any of the unlawful Torkelson

As a result of Torkelson's legal troubles, Marek found himself out of a job. (Tr. at 38.) Marek started his own firm, Financial Market Analysis, which would continue providing sworn declarations to Robbins Geller and other firms in the securities plaintiffs' bar. (Id.) Marek testified that for the last year or so, approximately 100% of his income has come from the securities' plaintiffs bar. (Id. at 38-39.) Marek also stated that he has "never offered and filed in opinion in federal court that a market was inefficient." (Id.)

Marek earned his undergraduate degree from the University of Pennsylvania – Wharton School of Finance. (Marek 7/1 Decl., Ex. A, dated July 1, 2013, ECF No. 54.) He does not have a graduate degree in any field (tr. at 36); he has never taught a course in any aspect of financial markets or market efficiency (id. at 35); he has never written an article or book in any area of financial markets or market efficiency (id.). The only writing that Marek has ever done on market efficiency is in connection with declarations for Robbins Geller and other similarly situated law firms in connection with federal court litigation. (Id. at 35-36.)

B. Marek's Opinions

It is Marek's opinion that the market for DB GRSs in the U.S. was efficient during the Class Period. (Tr. at 46; Marek 7/1 Decl. ¶ 7.) Marek performed an

---

declarations. (See Tr. at 38 (explaining that he did not work on any "fee declarations").)

analysis, which he regards as an event study, based on 12 days when DB publicly disclosed its earnings ("earning disclosure days" or "EDDs"). (See Tr. at 54.)[6]

### a. Overview of Marek's Analysis

The definition of market efficiency that Marek used was "whether information is readily disseminated and fully and accurately incorporated into the price of a security" (tr. at 23), and that "as a result of informational efficiency . . . the price represents the consensus of the market's value of the security" (id. at 24).

Marek bases his opinion that the DB GRSs market was efficient largely on a study he performed that he asserts demonstrates a cause and effect relationship between the price at which DB GRSs were trading and the impoundment (or incorporation/absorbtion) of material information. (See Marek 7/1 Decl. ¶ 59.) Marek claims that his study shows that material information was reflected in the share price. According to Marek, "[w]hen important, unexpected news about [DB] was released to the market, the price of its GRSs moved in a directionally appropriate way by a statistically meaningful amount." (Id. ¶ 61.)

### b. Analysis of NYSE

Marek has stated on various occasions in this case that his assignment was to review and discuss the efficiency of the "NYSE market" for DB GRSs during the Class Period. (See Marek 7/1 Decl. ¶ 2; Marek 9/23 Decl. ¶ 2, dated September 23, 2013, ECF No. 70; Tr. at 8, 10.) Marek testified that he had intended to study NYSE data only, and that at the time he wrote his initial declaration, this is what

---

[6] In total, there were 515 trading days during the Class Period; thus, the EDDs represent 2.3% of all Class Period trading days. (See Tr. at 17.)

he thought he had done. (See Tr. at 9-10.) At his deposition, Marek testified that he did not know whether DB GRSs traded in any U.S. market besides the NYSE.[7] (See Marek Dep. at 42.)

However, later in his deposition, Marek learned from information provided by an attorney for defendants at his deposition that his data actually included data from other U.S. exchanges in addition to the NYSE. (See Tr. at 12-13.) Once Marek learned that the data he had been using was based on trading of DB GRSs on other exchanges (in addition to the NYSE), he investigated his process and realized that inadvertently he had included all of the following U.S. exchanges in his data set: the NYSE, Archipelago Exchange ("NYSE Arca"), the Boston Stock Exchange, the Chicago Stock Exchange, Direct Edge, the Chicago Board of Options, and Financial Industry Regulatory Authority – Alternative Display Facility ("FINRA ADF").[8] (Id. at 9.)

In conjunction with these additional exchanges,[9] Marek failed to determine whether the markets for DB GRBs were efficient.[10] (See Tr. at 10 (Q: But when you

_____

[7] At the evidentiary hearing, it was clarified during Marek's cross examination that approximately 10% of DB GRS shares are traded in the U.S., and that approximately half of those shares are traded on the NYSE. (See Tr. at 21.)

[8] Marek explains: "During my deposition, I stated that the price and volume data I retrieved . . . for use in my analyses represented NYSE-traded GRSs only. In fact, the trading date used in my [d]eclaration represented consolidated U.S. market trading – while all of the GRSs were registered on the NYSE." (Marek 9/23 Decl. ¶ 9.)

[9] An analysis of just the NYSE (i.e., without other U.S. exchanges) would have been wholly inadequate because, among other things, DB GRSs traded on multiple U.S. exchanges during the Class Period. Nonetheless, this is precisely what plaintiffs hired Marek to do; and, it is what Marek thought he had done until defendants'

were looking specifically at, for instance . . . the robustness of the NYSE, you were only looking at the NYSE? A: Correct."); Marek 7/1 Decl. ¶¶ 24, 29-30,[11] 38, 40, 44 (analyzing the NYSE only).)  In other words, Marek inadvertently used (helpful) additional data, and then failed to take that data into account in conducting other portions of his analysis.

### c.  Failure to Analyze German Market

The vast majority of DB GRSs traded outside the United States – primarily in Germany.  (See Marek 9/23 Decl. ¶ 30).[12]  The German market was the primary price driver for GRSs trading in the U.S.  (See Tr. at 32).[13]  Additionally, a study conducted by Grundfest demonstrates that during the time when U.S. trading activity overlapped with German trading activity, the U.S. market reacted to the price of shares trading in Germany within seconds.  (See Marek 9/23 Decl. ¶ 17.)

Marek conceded that if price formation for a security was driven by an inefficient market and a second market followed the pricing in the first market, "hypothetically it could be termed inefficient."  (Id. at 32-34.)  Marek testified that if the price-forming market was inefficient, in order to determine whether the second

_____

counsel indicated otherwise.  (See Marek 7/1 Decl. ¶ 2; Marek 9/23 Decl. ¶ 2; Tr. at 10.)

[10] To the extent that Marek does discuss other U.S. stock exchanges, Marek admits that this was a cut-and-paste job gone awry.  (See Tr. at 10; Marek 9/23 Decl. ¶ 8.)

[11] The Court notes that there are two paragraphs numbered "30."

[12] Marek does not contest that "[t]he principal trading market for [DB] GRSs is the Frankfurt Stock Exchange, the largest of German's stock exchanges."  (Marek 9/23 Decl. ¶ 30 (citing Grundfest Decl. ¶¶ 9, 12).)

[13] According to Grundfest, and uncontested by plaintiffs, "price discovery" or "price formation" "typically refers to the process through which a market incorporates information into a security prices through investors' trading activities."  (Grundfest Decl. ¶ 29 (citation omitted).)

market was operating inefficiently as well or had managed to operate efficiently, he would need to "look further." (Id. at 34-35.)

As an additional point, Marek testified that information regarding German prices for the DB GRSs was efficiently impounded into the U.S. DB GRSs. (Id. at 56-57 (explaining that the fact that U.S. trading prices reacted within seconds to the German trading prices "furthers the evidence that the U.S. markets were informationally efficient").) Marek conceded that this is not the same – and does not purport to be the same – as whether the German market itself is efficiently impounding information. (Id. at 57-58.)

Grundfest testified that his study (on which Marek relies) examined the responsiveness of the U.S. price for DB GRSs to the German price; his study did not attempt to examine whether the German market is itself pricing the GRSs efficiently, or whether it is even impounding material information regarding DB in an efficient manner. (Id. at 106-07.) In explaining his study, Grundfest testified that the fact that the U.S. price for DB GRSs is so responsive to the German price "gives you zero information, zero[,] about the efficiency of the process occurring either in Germany or in the [U.S.]" (Id. at 107.)

Marek has not studied the efficiency of the German market. (Id. at 14.) He does not offer an opinion as to whether the German market in which the DB GRSs traded was efficient. (Id.)[14]

---

[14] In a response to a question by the Court, Marek testified that if, hypothetically, he knew that a small percentage (in the example, 2%) of shares were traded on the NYSE and a much larger percentage of shares were traded on other U.S. exchanges,

d.  Economic Turmoil and Short Sales Ban During Class Period

Marek testified that the proposed Class Period of January 2007 – January 2009 "was a period of economic turmoil." (Id. at 15, 18.) He agreed that "[e]conomies around the world went into recession. There were credit crises. There were crises in terms of liquidity at a number of companies. There were bankruptcies in the auto industry [and] large employers . . . ." (Id. at 16; see also Marek 9/23 Decl. ¶ 51.) Marek stated that "during this period occasioned by this turmoil there was a sheer enormity of [DB] company-specific news, a sheer enormity of financial industry-related and macro-economic-based material and unexpected news that came out during this Class Period." (Id.)[15]

In addition to the vast amount of information that was created during this time, short sales were banned in both the U.S. and Germany during portions of the Class Period. (Id. at 91.) The first short sale ban was in the U.S. and spanned the period from July 21, 2008 – August 12, 2008; the second in the U.S. was from

---

he would need to do additional testing to determine whether an opinion of efficient trading of such shares on the NYSE meant that the shares traded efficiently on all of the exchanges. (Tr. at 15-16.) During the oral argument portion of the October 4, 2013 hearing, plaintiffs' counsel argued that the Court's example of "2%" was determinative of the answer to that question – and suggested that the answer might have been consistent with Marek's overall opinion in this case if the Court had used a larger percentage. (Tr. at 123-24.) Notably, Grundfest testified credibly and uniformly that in light of the amount of trading on the German exchange, one could not reliably opine on the efficiency of the U.S. "markets" for DB GRSs without examining the efficiency of the German market. (Tr. at 115-16.)

[15] In fact, Marek stated that he has opined on market efficiency on 10 occasions and that this was "the most complex [and] labyrinthine" because it was difficult to set up an objective construct. (Tr. at 20.)

September 19, 2008 – October 8, 2008; in Germany, there was a short sale ban from September 20, 2008 – January 31, 2010.  (Id.)

According to Marek (as well as defendants' experts), arbitrage is one of the principal hallmarks of an efficient market; short sellers are important to the efficiency of a market.  (Id. at 24-25.)  Marek stated that if short sales were constrained, the mechanics and operation of the market could also be constrained.  (Id. at 25.)  Indeed, according to Marek, short sale bans "could delay the amount of time [ ] it takes for information to be fully reflected in the price of a security;" additionally, short sale bans "could increase transaction costs by, for example, raising bid-ask spreads because of reduced liquidity in the market for a particular security."  (Id. at 26.)

Nonetheless, while certain studies have looked at the impact of the short sale ban on liquidity of financial institutions, Marek did not know whether the studies looked in particular at the German short sale ban (which was of a significantly longer duration than the U.S. bans).  (Id. at 28.)  Marek also stated that he has never before offered an opinion as to market efficiency where the securities at issue had been subject to short sale bans during the Class Period.  (Id. at 25.)

In connection with the facts of this case, Marek testified that he understood that the DB GRSs were subject to short sale bans in both Germany and the U.S. during the Class Period and he stated that those bans were because "of the market turmoil involving financial institutions[,] specifically including [DB]."  (Id.)  Marek's first declaration does not discuss the fact of the short sale bans at all.  (See

generally Marek 7/1 Decl.)  With respect to short sale bans, his second declaration largely responds to the work performed by Gompers, which demonstrates a wider than normal bid/ask spread connected with the short sale bans.  (Marek 9/23 Decl. ¶¶ 61-68.)

Marek did acknowledge that "while the U.S. GRS bid-ask spread did rise during the ban periods, it is not clear that this widening was caused by the ban or some other factor." (Marek 9/23 Decl. ¶ 66.)  He asserts, however, that the bid-ask spread did not rise to a level "even remotely suggesting market inefficiency." (Id. ¶ 68.)  Marek agreed that it was possible that for a particular company, the market for the trading of its securities may be efficient at one point in time and inefficient at another.  (Tr. at 24.)

e.  Selection of Earning Disclosure Dates

In his initial declaration, Marek explained the appropriateness of his selected EDDs by stating:

> Because of the sheer enormity of the [DB]-specific financial industry-related and macro[-]economic-based material and unexpected news flow during the Class Period, for purposes of event identification corresponding to this Declaration, I will highlight here a clearly defined subset of [DB]-related events:  a total of 12 dates during the Class Period on which [DB] released quarterly and annual financial information or on which [DB] changed its earnings guidance.

(Marek 7/1 Decl. ¶ 57.)  However, at the evidentiary hearing, Marek denied having chosen the 12 selected EDDs due to the "sheer enormity of information." (Tr. at 17.)  Marek testified that he selected the EEDs because he determined that the "most

objective" way of conducting his analysis was to "isolate earnings disclosures versus [all] other dates." (Id. at 16.)[16]  Marek further stated that "for a securit[y] such as [DB], which is heavily followed by analysts and investors, it's also somewhat likely that those earnings have been anticipated and the earnings announcements are not going to [ ] create [ ] any material change in the price of the stock." (Id. at 43.)

Nevertheless, Marek equated the 12 EDDs with "news" days that he tested against "non-news" days. (Id. at 47.)  Despite his testimony that earnings were largely anticipated, Marek testified that he assumed in his analysis "that there was a higher probability of material unexpected news being released to the market on earnings disclosure dates in this instance than on non-earnings disclosure dates." (Id. at 48.)

As a criticism of Marek's selection and use of EDDs, Gompers' declaration stated that if the October 30, 2008 date was removed from Marek's EDDs, Marek's results no longer have the same statistical significance. (Gompers Decl. ¶ 63.)  In response, Marek testified that by that date, "the earnings concept . . . was nowhere near as important to these banks and financial institutions as the liquidity part of the earnings announcements." (Tr. at 49.)  Yet, Marek testified soon thereafter that the liquidity would be discussed on other, non-EDDs days within the 515 trading days as well (for instance, at investment conferences). (Id. at 50.)  Marek stated

---

[16] Marek explained: "The [DB] class period was one of the longer class periods.  It also entailed . . . a period of turmoil and a lot of news.  The more you start picking and choosing what you consider to be news, the more you become arbitrary in that selection." (Tr. at 18.)

that he had not considered using disclosures of liquidity instead of EDDs.  (Id. at 50 (stating "[i]t's just not something I considered").)

In conducting his analysis, Marek performed a regression analysis on the 12 EDDs to determine whether there was a statistically significant price movement associated with the EDDs as "news" days, thus suggesting that the market for DB GRSs was efficient.  (Id. at 54.)  Marek explained that the purpose of his regression analysis was to "directly measure the effect of information [here, the news disclosed on EDDs] on the price of U.S. traded [DB] GRSs."  (Id. at 54.)  According to Marek, his study of the 12 EDDs indicates that statistically significant price movement occurred 25% of the time.  (Id. at 30.)  While Marek stated that this indicated the market was efficient, he nonetheless agreed that if a company released material information and the price of its shares did not move, it could mean that the market was not efficient.  (Id. at 31, 32.)

C.  Criticisms of Marek

Defendants' proffered experts (Grundfest and Gompers) suggest that Marek's expert testimony should be disregarded.  Specifically, Grundfest stated that Marek's opinions are unreliable because he failed to analyze: "(1) the mechanics of price formation on the German equities markets; (2) a study of the efficiency of the [DB] GRSs as traded on their German home markets during the alleged Class Period; and (3) . . . the relationship between trading on the German markets and trading on the [U.S.] markets."  (Grundfest Decl. ¶ 9.)  Gompers opined that Marek's analysis

14

"suffers from serious conceptual and methodological flaws and deficiencies, rendering his opinions unreliable." (Gompers Decl. ¶ 6.)

  a.  <u>Grundfest</u>

  i.  <u>Grundfest's Qualifications</u>

Grundfest is the William A. Franke Professor of Law and Business at Stanford Law School. (Grundfest Decl. ¶ 1.) He co-directs the Arthur and Toni Rembe Rock Center for Corporate Governance at Stanford, as well as Stanford's Directors' College (which provides courses for directors of publicly traded companies). (<u>Id.</u>) Grundfest established and serves as a principal investigator for the Stanford Class Action Securities Clearinghouse, a data source for empirical analyses of class action litigation. (<u>Id.</u>)

Additionally, Grundfest was formerly a Commissioner of the Securities and Exchange Commission ("SEC") for four years. (<u>Id.</u> ¶ 2.) He is an attorney – he earned his law degree at Stanford Law School – and has completed all necessary coursework for a Ph.D. in economics. (<u>Id.</u> ¶¶ 2-3.) He has completed the M.Sc. program in mathematical economics and econometrics at the London School of Economics and has an undergraduate degree from Yale in economics. (<u>Id.</u>) He has worked as an economist and econometrician at the Rand Corporation and at the Brookings Institute, and has served as a senior economist on the President's Council of Economic Advisors, where he was responsible for the capital markets desk. (<u>Id.</u>) Grundfest has published numerous articles analyzing economic aspects of the financial markets. (<u>Id.</u> ¶¶ 4-5.) In particular, he has a forthcoming article in

the Financial Review relating to information transmission between financial markets.  (Id. ¶ 5.)  The courses he currently teaches at Stanford cover, inter alia, the efficient market hypothesis and the 2008-09 financial crisis.  (Id.)

The Court finds Grundfest well-qualified to offer the opinions he has presented in this case.  At the evidentiary hearing, the Court found Grundfest consistent, articulate, responsive, and credible.  In any area in which Grundfest and Marek conflicted, the Court found Grundfest's analysis to be the more reasoned and persuasive.

ii.  Marek's Failure to Analyze the German Market

Grundfest's declaration and testimony focused on Marek's failure to analyze the informational efficiency of the German market, which is where pricing for DB GRSs is primarily set.  (Grundfest Decl. ¶ 9.)  The facts contained in Grundfest's declaration, and to which he testified, were not only uncontested by Marek, but in fact, Marek embraced them.  (See, e.g., Marek 9/23 Decl. ¶¶ 16-34; Tr. at 35.)

Put simply, Grundfest and Marek differ as to whether the speed at which "pricing" information from Germany is impounded into the price of DB's GRSs traded in the U.S. is proof of broad informational market efficiency in the U.S. Grundfest says no, not in and of itself; Marek says yes.

As set forth above and below, Marek's initial declaration does not address the fact that the vast majority of the trading volume of DB GRSs occurred in Germany, not the U.S.  Grundfest's declaration demonstrates that this is certainly the case. (Grundfest Decl ¶ 15.)  Indeed, during the Class Period, over 90% of all DB GRS

shares were traded outside the U.S., primarily in Germany.  (Tr. 21; Grundfest

Decl. ¶ 12.)  DB's GRSs traded on six other German stock exchanges, as well:

Berlin, Düsseldorf, Hamburg, Hanover, Munich, and Stuttgart.  (Id.)  (The record is

silent as to what percentage of DB shares traded on the London or Paris

exchanges.)  There is a two to three hour overlap (depending on daylight savings

time) between trading on the NYSE and in Germany.[17]  (Id. ¶ 13.)

There are key differences between the trading of DB's GRSs in Germany

versus the U.S.  (Id. ¶ 14.)  Grundfest's work shows that "U.S. trading volume made

up only roughly 7.6% of the sum of German and U.S. trading volume."  (Id. ¶ 15.)

The trade frequency of DB shares in Germany (defined as the number of shares

traded per minute each trading day) is, on average, 2.6 times that in the U.S.  (Id.)

The average size of a DB share trade is larger in Germany than in the U.S.: 646

shares per trade in Germany as compared to 187 in the U.S.  (Id.)  According to

Grundfest, those differences in trading frequency and trade size are statistically

significant.  (Id.)

Grundfest states: "Theory in market microstructure has posited that, all else

being equal, informed traders . . . would prefer to trade in more liquid and deeper

markets."  (Id. ¶ 16.)  Thus, "[t]he fact that trading volume is substantially greater

---

[17] Grundfest explained: "Regular trading hours on the NYSE are 9:30 AM to 4:00
PM, Eastern Time.  During most of the alleged Class Period, there is a two-hour
overlap, from 9:30 AM to 11:30 AM, Eastern Time, between the NYSE trading day
and the Xetra [the trading system for all securities listed on the Frankfurt Stock
Exchange] trading day.  There is a three-hour overlap, from 9:30 AM to 12:30 PM,
Eastern Time, when Daylight Savings Time is not synchronized between the U.S.
and Germany."  (Grundfest Decl. ¶¶ 12-13.)

in Germany is [ ] consistent with the notion that the German markets are the dominant venue in which information would be impounded into [DB] GRS price." (Id.)

In fact, U.S. investors comprise only one half of one percent of all of the DB shareholders during the Class Period. (Id. ¶ 17.) Those investors held a total of between 9.66% and 13.20% of DB GRSs during the Class Period. (Id.)[18]

According to Grundfest: "What you typically want to do is analyze the market where price formation is actually occurring. . . . If the security is trading in two markets, which market do we care about in terms of efficiency[?]  Is it the market where 90[%] of the trading actually occurs? . . .  [V]arious forms of statistical analysis will tell you that 80-90[%] of the information coming to that market is the German information coming to the U.S. market[.]. . ." (Tr. at 115.)  Grundfest explained that "common sense suggests that if this is a market where prices are formed in Germany, let's look at price formation in Germany to determine the efficiency of that market." (Id.)  Grundfest then noted that Marek "hasn't looked at price formation in Germany whatsoever." (Id.)

Grundfest explained that his report demonstrates that information regarding DB tends to be disclosed first in Germany, while the U.S. markets are closed; DB "tends to disclose its information just prior to the opening of the European markets." (Id. at 116.)  According to Grundfest, "that means that the initial price

_____

[18] Marek testified that he has never expressed an opinion as to market efficiency where the trading on the market he was examining constituted less than 50% of the trading of the security at issue.  (Tr. at 22-23.)

response to the information is actually going to occur in the German markets.  If you want to test how quickly the German markets absorb the information, you can't do that unless you look at the actual German market prices, and Mr. Marek hasn't done any of that."  (Id. at 116-17.)

Grundfest analyzed the timing of the release of the firm-specific disclosures and news releases that allegedly contained the material information described in the Amended Complaint.  (See Grundfest Decl. ¶ 21.)  With one potential exception on June 14, 2007,[19] all but one of the statements was first released to the German markets when the U.S. markets were closed, and often many hours before the NYSE opened.[20]  (Id.)

Grundfest also analyzed the 12 EDDs that Marek used in his event study.  (Id. ¶ 22.)  The earnings disclosures on each of the 12 EDDs occurred before the U.S. markets were open; the earnings disclosures were released either a few hours before or just after the German markets opened.  (Id.)  Grundfest argues that "[a]n examination of stock price movements during the window when the U.S. market was closed" as opposed to when it was opened suggests that when Marek claims there is a causal relationship between "news" and movement in DB GRS prices, the movement happened in Germany first.  (Id. ¶ 24.)  Specifically, Grundfest's Exhibit

---

[19] On June 14, 2007, a DB executive allegedly made a misstatement to investors at a conference in Lisbon, Portugal.  (Grundfest Decl. ¶ 21, n.23.)  Accordingly, Grundfest states that while this statement was not released to German markets first, "it is likely that this news was first released to the investing public in Europe." (Id.)
[20] The alleged statement which occurred in London appears to have been at an hour when the U.S. markets were open.  (Grundfest Decl. ¶ 21, n.24.)

7 shows the 12 EDDs chosen by Marek for his "event" study -- on only three out of the 12 EDD days did statistically significant price movement occur (i.e., 25% of the time). (Id. ¶ 25.) According to Grundfest's analysis, the statistically significant price movement occurred in Germany first. (Id.) Grundfest criticized Marek for not undertaking a similar analysis of the German market and for "fail[ing] to consider the potential implications of the U.S. market price reversals" in his analysis. (Id.)

As plaintiffs highlight, Grundfest's analysis does not determine whether the German market is efficiently impounding information into the GRS price. (Id. ¶ 27; Tr. at 106.) Rather, Grundfest's analysis "simply indicates that, when Mr. Marek claims that a stock price movement was caused by potentially material information, price formation seems to have primarily taken place in Germany before U.S. investors started trading on such information." (Id. ¶ 27.) As a result, according to Grundfest, "stock price analyses that focus solely on the U.S. markets [i.e., Marek's analysis] overlook the true locus of price formation." (Id.)

In addition to determining that most potentially material, firm-specific information either alleged by plaintiffs' in their Amended Complaint or used by Marek drove prices in Germany first, the data established that when both the U.S. and German markets were open, the German market led in price discovery generally. (Id. ¶ 28.)

b. <u>Gompers</u>

i. <u>Gompers' Qualifications</u>

Gompers is the Eugene Hofman Professor of Busines Administration and Faculty Chair of MBA Elective Curriculum at the Harvard Business School. (Gompers Decl. ¶ 1.)  Gompers teaches courses and conducts research in the areas of corporate finance, the structure and governance of public and private companies, valuation of companies, the behavior of institutional investors, and entrepreneurial finance and management.  (<u>Id.</u>)  He teaches courses to Ph.D., MBA, and Executive Education students.  (<u>Id.</u>)

In addition to his teaching responsibilities, Gompers is a Research Associate at the National Bureau of Economic Research.  (<u>Id.</u>)  He joined Harvard in 1995. (<u>Id.</u>)  Prior to that, Gompers was a member of the faculty of the University of Chicago Graduate School of Business.  (<u>Id.</u>)  He earned his Ph.D. in Business Economics from Harvard and also earned an economics degree from Oxford.  (<u>Id.</u>) Gompers has written numerous research articles, case studies, and notes that have dealt with market efficiency and the impact of market inefficiency on firms and investors.  (<u>Id.</u> ¶ 2.)  He is an editor and referee for several academic journals in the area of economics.  (<u>Id.</u>)

At the evidentiary hearing in this matter, Gompers was clear, articulate, and credible.  He presented the basis for his critiques with reference to academic work. The Court found him reliable and plainly an expert in studies of market efficiency. Based on his qualifications, quality and depth of reasoning, and manner of

presentation, the Court credits and relies on Gompers over Marek on all points as to which they disagree.

ii.  Gompers' Critique of Marek's "Event" Study

In providing a critique of Marek's methodology, Gompers testified: "In any context of market efficiency, Mr. Marek's report does not demonstrate that the [DB] GRSs were traded in an efficient market.  There is no definition of efficient market efficiency under which Mr. Marek's analysis could affirmatively demonstrate that the [DB] GRSs traded in an efficient market." (Tr. at 65.)  Indeed, Gompers has identified a number of what he characterized as "serious conceptual and methodological flaws and deficiencies, rendering [Marek's] opinion unreliable." (Gompers Decl. ¶ 6.)

As an example, Gompers points to Marek's failure to account for recent research on the role of arbitrage in the functioning of an efficient market.[21]  (Id. ¶ 7.)  According to Gompers, at least one of Marek's citations is based on old research setting forth now discarded assumptions regarding the role of arbitrage in an efficiently functioning market.  (Id. ¶ 27.)  Gompers states that, in this case, the financial crisis and short sale bans caused malfunctioning of arbitrage and should

---

[21] Gompers explains: "Over the past four decades since the development of the Efficient Market Hypothesis, researchers' understanding of how securities markets function, as well as whether and when they function efficiently, has evolved tremendously.  A large and growing body of academic research has documented evidence that even in an active and competitive market, various innate or externally-imposed frictions can result in the price of a stock moving in a manner inconsistent with the implications of the Efficient Market Hypothesis.  A central tenet of recent research on market efficiency has highlighted, in particular, the role that effective functioning of arbitrage plays in ensuring market efficiency." (Gompers Decl. ¶ 7.)

have been analyzed for any impact on market efficiency.[22] (Id. ¶¶ 8, 28-34.) Gompers notes that Marek failed to undertake such a study even though he conceded at his deposition that he was aware of the short sale restrictions during the Class Period and agreed that they could make the market "less than perfectly efficient." (Id. ¶ 35.)

As an additional example of the problems with Marek's study, Gompers explains that Marek's "event study," which purports to show the cause and effect relationship (which corresponds to the fifth Cammer factor, discussed infra), was methodologically flawed. (Id. ¶¶ 10-12, 37-73.)

In conducting his analysis, Marek studied the average absolute residual returns and the standard deviation of residual returns between the 12 EDDs and the 503 non-EDDs (which together comprise the 515 trading days during the Class Period). (Gompers Decl. ¶ 38.) Marek finds that there is a high price volatility on the EDDs relative to the non-EDDs and concludes that the difference in volatility is indicative of the security trading in an efficient market. (Id.; see Marek 7/1 Decl. ¶¶ 58-59.) Marek also finds that 25% of the EDDs have a statistically significant return versus the non-EDDs and concludes that the difference is unlikely to be driven by random chance; therefore, he concludes, the GRSs traded in an efficient market. (Gompers Decl. ¶ 39; see Marek 7/1 Decl. ¶ 61.)

---

[22] Gompers noted that short sale restrictions – both generally and in relation to those that were imposed during the recent financial crisis – "have been shown to be linked to a significant deterioration of market function and efficiency." (Gompers Decl. ¶ 8.)

Gompers states that Marek wrongly assumed that the 12 EDDs provided a basis for assessing price reaction to material, unexpected news; Gompers also contends Marek's methodology in performing the regression was itself flawed. (Gompers Decl. ¶¶ 11-14.) Gompers explains that "rather than testing if the market is consistently efficient in incorporating all information, Mr. Marek only tests whether his event days are on average more likely to have statistically significant residual returns than" non-EDDs. (Id. ¶ 12.) Gompers also criticizes Marek's data set as too limited in that it comprises only 2% of all trading days during the Class Period; Gompers further contends that Marek's selection of those EDDs "is haphazard and inconsistent." (Id.) Moreover, Gompers states that the EDD study fails to examine whether the allegedly material disclosures set forth in the Amended Complaint caused a statistically significant price movement. (Id.) Gompers asserts that Marek's results in fact demonstrate that on the corrective disclosure dates, there was not a statistically significant price decrease. (Id.) Gompers also criticizes Marek for looking at a single type of information (i.e., EDDs); in Gompers' opinion, this one type of information would not provide a sufficient foundation to opine on a market's efficiency. (Tr. 101 (explaining that no one type of information is sufficient to determine market efficiency).)

Gompers also testified that Marek did not examine whether the EDDs presented "new" news or instead, already anticipated news. (Tr. at 73 (explaining that Marek "doesn't look at expectations").) (Id.) In fact, according to Gompers, the EDDs "aren't news days," but instead, "are days that Mr. Marek has selected that

are days on which earnings disclosure information comes out. . . ." (Id. at 76.) In his declaration, Gompers opines that "Marek's failure to identify any material, unexpected earnings news and analyze its value implication, he is not 'likely understating the correspondence between material, unexpected news and a significant change in the price of GRS,' but rather abstaining from analyzing the existence of any such causal correspondence." (Gompers Decl. ¶ 50 (citing Marek 7/1 Decl. ¶ 57).)

In addition, because Marek does not make a directional prediction of what price movement ought to be ex ante, but instead relies on the judgment of traders, "he seems to be ready to conclude that the view of the market as reflected in the price must be correct. If so, Mr. Marek's purported cause and effect test effectively presupposes his conclusion of market efficiency." (Id. ¶ 51.)

Gompers analyzes one of the EDDs – October 30, 2008 – and determines that while Marek found that it corresponded with a statistically significant return (and indeed, drove a large part of Marek's finding of statistically significant returns on 25% of the EDDs), in fact the GRSs moved in a directionally inappropriate manner on that day.[23] According to Gompers, the EDD contained a negative disclosure relating to investment banking losses and a write-down of assets. (Id. ¶ 52.) In

---

[23] In his reply declaration, Marek provides an explanation of why he disagrees with Gompers' view of appropriate directionality on October 30, 2008. (See Marek 9/23 Decl. ¶ 54.) There is no indication he performed such an analysis prior to receiving Gompers' criticism.

addition, while DB beat earnings expectations, it did so based on one-time items. (Id. ¶ 54.)[24]

In Gompers' opinion, if material information is impounded into a stock price, and the stock moves in a directionally inappropriate manner, that is an indication of market inefficiency. (Tr. at 86.)  Gompers testified that "every single study of earnings announcements has built models to look at earnings expectations and they look at how realized earnings are different from expected earnings. . . . It's absolutely necessary to look at [whether] the news on this day anticipated or not." (Id. at 86-87.)

As an additional point, Gompers opined that Marek fails entirely to account for the fact that DB GRSs were subject to short sale bans in both the U.S. and Germany during the Class Period.  (See, e.g., Gompers Decl. ¶ 84.)  Gompers performed a study that demonstrates put/call parity was impacted during the short sale bans.  (Tr. at 91-92.)  According to Gompers, it is more likely than not that an efficient market can be rendered inefficient for a period of time in the event of a short sale ban.  (Id. at 94-95.)  Gompers explains that the inefficiency is because negative information cannot be impounded into the price of a security as would be the case without a ban.  (Id. at 95-96.)  This provides yet another reason that Gompers believes Marek's analysis is seriously flawed.

---

[24] According to Gompers, once October 30, 2008 is removed from the other results, the absolute residual returns that Marek has shown are barely higher on EDD days than on non-EDD days. (Id. ¶ 63.)

DEFENDANTS' DAUBERT MOTION

As set forth above, Marek opines that the market for DB GRSs in the U.S. was informationally efficient during the Class Period. (Tr. at 46.)

Relying on the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny, defendants assert that Marek is both unqualified to offer any opinion on market efficiency and that the work he has here proffered in support of his opinions is, in any event, methodologically flawed.

The Court agrees.

## I.   Legal Standard for Daubert Motions

While expert testimony can be useful to both courts and juries in securities cases,[25] an expert must, in fact, be an expert; and, his or her opinions must demonstrate such expertise. A trial court is tasked with the responsibility of weeding out proffered expert opinions which do not meet certain required standards. Daubert, 509 U.S. at 597; see also Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008). Such an evaluation requires more than a passing inquiry into whether "it looks like a duck and quacks like a duck." Instead, the Court must delve more deeply into whether the proffered duck is – in fact – a duck at all; and whether if a duck, it is doing the types of things a Court would expect a duck to do. Failure as to either the first or the second inquiry

---

[25] See, e.g., U.S. v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) (explaining the potential usefulness of expert testimony in the context of a jury trial).

requires that the Court serve its gatekeeper function and exclude the declaration or testimony.

The Court's gate-keeping role is based Rule 702 of the Federal Rules of Evidence. Fed. R. Evid. 702.[26] Daubert discusses Rule 702 at length.[27] In its decision, the Supreme Court made it quite clear that a court should not simply accept a proffered expert – even if he has been accepted as such before; the law requires an inquiry into whether an expert is an expert, and some degree of "regulation of the subjects and theories about which an expert may testify." Daubert, 509 U.S. at 589.

Daubert requires three separate inquiries: (1) whether the proposed expert is in fact qualified to offer the opinions he or she is proffering; (2) whether each proposed opinion is based upon reliable data and methodology; and (3) whether the proposed testimony would be helpful to the trier of fact or to answer the factual question presented. See Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005); see also Arista Records LLC v. Lime Grp. LLC, 06 Civ. 5936, 2011 WL 1674796, at *1 (S.D.N.Y. May 2, 2011).

---

[26] Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.
[27] The language of Rule 702 has changed twice since Daubert; in 2000 and again in 2011.

Plaintiffs bear the burden of establishing by a preponderance of the evidence that Marek has the appropriate qualifications and that his declarations and testimony meet the requirements of Rule 702.  <u>Daubert</u>, 509 U.S. at 593, n.10 (citation omitted); <u>United States v. Williams</u>, 506 F.3d 151, 160 (2d Cir. 2007) (citations omitted); <u>Arista Records</u>, 2011 WL 1674796, at *1.  The fact that defendants' experts have not proffered analyses that disprove market efficiency is irrelevant – defendants do not bear such a burden.  Defendants' experts may and have limited their declarations and testimony to criticizing that of plaintiffs' expert, Marek.  In the context of the pending motions, the Court must then determine whether such criticisms are valid and whether, notwithstanding the criticisms, plaintiffs have carried their burden.

II.   <u>Marek Lacks the Necessary Qualifications</u>

Whether a proposed expert has the requisite qualifications depends on his or her educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to express.  See <u>Arista Records</u>, 2011 WL 1674796, at *2 (citations omitted); <u>see also</u> <u>United States v. Tin Yat Chin</u>, 371 F.3d 31, 40 (2d Cir. 2004) (citations omitted) (explaining that experts should only be allowed to testify in areas within their field of expertise); <u>Cary Oil Co. v. MG Refining & Mktg., Inc.</u>, 99 Civ. 1725, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (citation omitted).

In the Second Circuit, courts have construed the inquiry into an expert's qualifications with an eye towards the "liberal thrust" of the Federal Rules and their general relaxation of traditional barriers to "opinion testimony."  <u>Daubert</u>, 509

U.S. at 588-89 (citations omitted); In re Rezulin Prods. Liab. Litig., 309 F.Supp.2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.") (citation omitted).  A "liberal thrust" does not, however, mean that the requirement that a proffered expert actually be an expert in the field in which he purports to provide opinions is eliminated.

In this case, Marek's expertise is being an expert in plaintiffs' securities cases.  That, under Daubert, is not sufficient to qualify as an expert.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) (stating that a district court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 266-67 (2d Cir. 2002) (noting that an expert's testimony is only admissible if the expert's analysis "is reliable at every step" and further, that "the Daubert requirement that the expert testify to scientific knowledge – conclusions supported by good grounds for each step in the analysis – means that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible" (internal quotation marks and citations omitted)).

While Marek has proffered opinions in areas as diverse as damages, loss causation, and market efficiency in his career,[28] and although Marek has "achieved professional designation of Chartered Financial Analyst" and is a member in good standing of the CFA Institute (see Marek 9/23 Decl. ¶ 4), Marek does not have any of the basic graduate education, teaching, or research experience or publications that would provide the Court some basis to believe that he has the qualifications necessary to make his opinions reliable: he has not been specially trained by academics in the field; he has not written articles, taught any courses, or conducted any relevant research. Instead, Marek's training appears to have been one year he spent working for a firm after college and then his work for an economist who was later indicted for submitting false declarations. The fact that Marek has – after Torkelson was indicted – now gone into business as an "expert" himself, does not an expert with reliable qualifications make. See In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 179 (S.D.N.Y. 2009) (explaining that "[t]he strength of an expert's qualifications provides circumstantial evidence of reliability" and noting that the "more qualified the expert, the more likely that expert is using reliable methods in a reliable manner . . . .") (quotation marks and citations omitted).

---

[28] See, e.g., In re Imperial Credit Indus., Inc. Secs. Litig., 252 F.Supp.2d 1005, 1014 (C.D. Cal. 2003) (finding Marek's work deficient and unreliable); Carpe v. Aquila, Inc., 2005 WL 1138833, at *4 (W.D. Mo. Mar. 23, 2005) (excluding Marek's report on the basis that his work was fatally flawed and not resting on a reliable basis); In re Organogenesis Secs. Litig., 241 F.R.D. 397, 401-02 (D. Mass. 2007) (rejecting Marek's opinion); In re World Access, Inc., 310 F. Supp. 2d 1281, 1298-99 (N.D. Ga. 2004) (suggesting Marek's opinion was incomplete); Fruchter v. Florida Progress Corp., 2002 WL 1558220, at *3, 10-11 (Fla. Cir. Ct. Mar. 20, 2002); Billhofer v. Flamel Techs., S.A., 281 F.R.D. 150, 160-64 (S.D.N.Y. 2012).

For this court to rely on testimony from someone who lacks real expertise asks this Court to dispense with the need for real qualifications.  That is not the law.  One cannot become an expert simply by deeming himself as such.  <u>SEC v. Tourre</u>, No. 10 Civ. 3229, 2013 WL 3089031, at *7 (S.D.N.Y. June 18, 2013) (citing <u>Thomas J. Kline, Inc. v. Lorillard, Inc.</u>, 878 F.2d 791, 800 (4th Cir. 1989) ("Although it would be incorrect to conclude that [the proposed expert's] occupation as a professional expert alone requires exclusion of her testimony, it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying.")).

Several of the flaws in Marek's analysis demonstrate his lack of true qualifications.  For instance, in Marek's first report, he fails to tackle plainly important considerations:  that more than 90% of the DB GRSs were traded outside the U.S., that another market (Germany) drove the pricing in the U.S., that the financial crisis was ongoing throughout the Class Period, and that there were short sale bans in both the U.S. and in Germany at various points during the Class Period.  <u>See</u> <u>In re Zyprexa Prods. Liab. Litig.</u>, 489 F. Supp. 2d 230, 284-85 (E.D.N.Y. 2007) (explaining that an expert must use sound scientific methodology, which "requires a scholar to make some effort to account for alternative explanations for the effect whose cause is at issue") (citations omitted).

Marek's lacking expertise is also apparent in other ways.  For example, his first report demonstrated a lack of awareness of current research in the area of market efficiency.  (<u>See</u> Gompers Decl. ¶¶ 6-7, 18-27.)  In addition, Marek misread

the data set that he was using – believing it was NYSE alone; it was not.[29]  In addition, Marek stated that earnings were anticipated by the market but then proceeded to use EDDs as his primary data set.  This suggests that the approach was structurally flawed:  potentially, the EDDs did not necessarily contain new information because the information was already anticipated prior to the EDD; while earnings disclosures might contain other information, Marek did not investigate whether any of the additional information was itself new.  Marek also failed substantively to take into account that DB was a financial institution undeniably impacted by world's most recent financial crisis during the Class Period.[30]

The Court was also singularly unimpressed with Marek's in-court testimony. Marek was evasive in answering questions when such answers were inconvenient, he contradicted what he said at deposition or in his declarations, and he simply changed his testimony if additional prodding by plaintiffs' counsel made it clear that it was better for their case that he do so.

In short, if Daubert's requirement that an expert be sufficiently qualified and have a certain level of expertise is to mean anything, it must mean that such

_____

[29] This turned out to be a fortunate error in one regard:  without consolidated data, Marek would have been analyzing the data of only one of several exchanges that traded the DB GRSs in the U.S.

[30] Marek did acknowledge that because DB was a financial institution during the financial crisis, there was a tremendous quantity of information during the Class Period – a "sheer enormity."  (Marek 9/23 Decl. ¶ 57.)  Rather than critically analyze how that market position may have impacted his analysis, however, Marek avoided addressing its complexities by choosing the 12 most anticipated information days during the 515 trading days during the Class Period.

qualifications and expertise be real – simply being an expert at being an expert is not enough.

Accordingly, this Court finds Marek unqualified to offer declarations and testimony in this case.

III.   Flaws in Marek's Methodology

Even were this Court were to overlook Marek's lack of expertise, it would nonetheless preclude his declarations and testimony on the basis that his opinions are based on unreliable and flawed methodology.

The reliability of a proposed expert's testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. Among the questions to be answered is whether the theory or methodology can be tested, whether it has been subjected to peer review, whether it has a potential rate of error, and whether it is a "generally accepted" methodology or theory. Id. at 593-94. In Weisgram v. Marley Co., the Supreme Court stated that expert testimony must meet "exacting standards of reliability." 528 U.S. 440, 455 (2000) (citations omitted). "[T]he Supreme Court has also stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions." Nimely, 414 F.3d at 396. A court's inquiry as to whether an expert's proffered opinion is reliable is context specific; the question is not whether the expert methodology might be generally reasonable but

34

rather whether in the context of the particular matter at hand it is reliable.  See Development Specialists, Inc. v. Weiser Realty Advisors LLC, No. 09 Civ. 4084, 2012 WL 242835, at *8 (S.D.N.Y. Jan. 24, 2012) (citation omitted).  In other words, does the proposed expert's proffered opinion(s) "fit" the case at hand?  Daubert, 509 U.S. at 591-92.

Here, Marek's analysis regarding market efficiency for DB GRSs suffers from certain significant flaws.  First, Marek fails adequately to account for the fact that over 90% of DB's GRSs traded in a market other than the one he studied (and indeed, outside the U.S.).  The significance of this failing is readily apparent when placed against Marek's concession that German pricing drove U.S. pricing.  (Tr. at 61 (relying on Grundfest's data, Marek stating that it appears that the U.S. is responding to Germany about 80% of the time).)  Marek did not recognize this fact in his analysis, let alone perform any work to determine whether the German pricing was occurring in an efficient or inefficient market.  As a result, Marek's analysis is limited to the U.S. market's ability to efficiently impound one piece of information:  German pricing.  That says nothing about whether that pricing is itself based upon efficient impoundment of information.

Grundfest's work reveals the significance of this flaw.  Indeed, Grundfest shows that virtually all of the significant information that Marek himself examined occurred when the U.S. market was not even open; the information was therefore impounded efficiently or inefficiently (including not at all) into the German price, on which the U.S. price was based.  Failure to examine or render any opinions

concerning the primary market in which the security at issue traded undermines any opinion as to whether that security traded in an efficient market.

Second, Marek's analysis fails to account for the particular circumstances impacting financial institutions during the financial crisis. For instance, Marek fails to take into account any market impact of the periods during which the U.S. and Germany had imposed short sale bans. He did so while acknowledging that arbitrage is one of the drivers of an efficient market. (Tr. at 24.) Moreover, while Marek acknowledged at one point that liquidity was a more important factor than earnings during the financial crisis, and indicated in response to the Court's question that there would be non-EDDs on which DB made statements about liquidity (id. at 49-52), Marek later seemed to back-pedal from that answer (id. at 52).

Third, Marek's choice of EDDs as the totality of information that he needed to test in order to determine market efficiency makes little sense in the context of the DB GRSs during this Class Period. As Marek acknowledged, earnings were largely anticipated and there was a "sheer enormity" of information (apart from earning disclosures) about DB during the Class Period. In addition, he assumed that the price of the DB GRS was appropriate – as it was based on the combined wisdom of "thousands" of traders. In this way, as Gompers suggested, Marek's analysis is tautological – one cannot rely on the wisdom of the traders to conclude that the price was efficient when the efficiency of the market is what Marek himself has been hired to determine.

Fourth, even were the Court to put aside all of these other issues, the Court credits the testimony and declarations of Gompers that Marek's regression was not performed according to reliable methodology.  (See, e.g., Gompers Decl. ¶¶ 66-68.)

For all of these reasons, the Court finds that Marek's opinions are based on unreliable and flawed methodology.  The Supreme Court has made it clear that the Court should not ignore such flaws – but rather should place such flaws against the requirements of the standards set forth in Daubert.

Marek's opinions do not pass muster under Daubert and accordingly, they are excluded.

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs have moved to certify the following class:

> All purchasers of Deutsche Bank AG ("Deutsche Bank" or the "Company") ordinary shares on the New York Stock Exchange ("NYSE") and all purchasers of Deutsche Bank ordinary shares in any domestic transaction from January 3, 2007, through January 16, 2009 (the "Class Period"), who were damaged as a result of defendant's violations of the federal securities laws.  Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendant have or had a controlling interest.

(Pls.' Mem. Supp. Class Cert. ("Pls.' Class Mem.") at 1, dated July 1, 2013, ECF No. 52.)  Defendants oppose class certification on the basis that plaintiffs have failed to carry their burden of proving by a preponderance of the evidence each of the

required elements of Rule 23 of the Federal Rules of Civil Procedure, 28 U.S.C. § 23(a), (b)(3).  (See Defs.' Class Opp'n at 1.)

In particular, defendants assert that the named plaintiffs are neither typical nor adequate representatives (id. at 19-21), and that individual questions will predominate over common ones (id. at 8-12).  In regards to the latter, defendants point to the lack of sufficient evidence to demonstrate that DB GRSs traded in an efficient market during the entirety of the Class Period, thereby removing plaintiffs' ability to rely on the fraud-on-the-market theory to show reliance.  (Id.)  In addition, defendants argue that the named plaintiffs are subject to unique defenses that also make them inadequate representatives – and that mini-trials would be required as to those defenses, again causing individual issues to predominate.  (Id. at 16-19.)

For the reasons set forth below, the Court agrees.  Even had the Court not excluded the Marek declarations, plaintiffs have failed to carry their burden of proof under Rule 23.

I.    Legal Requirements For Class Certification

A plaintiff seeking to certify a class must prove by a preponderance of the evidence that its proposed class meets the requirements of Rule 23(a) and, if those requirements are met, that the class is maintainable under at least one of the subdivisions of Rule 23(b).  See Wal-Mart Stores, Inc. v. Duke, – U.S. – , 131 S.Ct. 2541, 2548 (2011).  Plaintiffs here seek certification under Rule 23(a) and Rule 23(b)(3).

Pursuant to Rule 23(a), a plaintiff seeking certification first must demonstrate that: (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. See Fed. R. Civ. P. 23. These requirements are colloquially referred to, respectively, as numerosity, commonality, typicality, and adequacy.

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see also In re Initial Public Offering Secs. Litig., 471 F.3d 24, 33 (2d Cir. 2006).

Rule 23 is not a mere pleading standard. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule . . . ." Wal-Mart Stores, Inc., 131 S. Ct. at 2551. "'In evaluating a motion for class certification, the district court is required to make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, and must resolve material factual disputes relevant to each Rule 23 requirement.'" Severin v. Project Ohr, Inc., No. 10 Civ. 9696, 2012 WL 2357410, at *4 (S.D.N.Y. June 20, 2012) (quoting Brown v. Kelly, 609 F.3d 467, 476 (2d Cir. 2010) (internal quotation marks and citation ommited)). The district court must "receive enough evidence, by affidavits,

documents, or testimony, to be satisfied that each Rule 23 requirement has been met." In re Initial Public Offering Secs. Litig., 471 F.3d at 41.

II.     Rule 23(a)

    A. Numerosity and Common Questions of Law and Fact

In this case, there is no issue of numerosity or that at least one common question of law or fact exists.[31]

According to Second Circuit precedent, "numerosity is presumed at a level of 40 members." Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) (citations omitted). "Plaintiffs need not set forth an exact class size to establish numerosity." In re Bank of Am. Corp., 281 F.R.D. 134, 138 (S.D.N.Y. 2012). There are certainly at least 40 members of the proposed class in this case. As for the requirement that there be common questions of law and fact, it is clear that a there would be at least one common question for the proposed class:  did defendants in fact engage in the violations of the securities laws alleged?

    B. Typicality and Adequacy

Defendants here contest the typicality and adequacy of the named plaintiffs. (Defs.' Class Opp'n at 19-24.)  The Court finds that while typicality is satisfied, adequacy is not.

In the Second Circuit, typicality is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." See In re Flag Telecom Holdings,

---

[31] Defendants do not contest either numerosity or the existence of at least one common question.

Ltd., Secs. Litig., 574 F.3d 29, 35 (2d Cir. 2009) (quotation marks and citation omitted).  If the same allegedly unlawful conduct was directed at or affected them both, the typicality requirement is usually met.  See Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir. 1993).

To satisfy the adequacy requirement, plaintiffs must prove that the interests of the named plaintiffs are not antagonistic to other members of the class.  See In re Flag Telecom, 574 F.2d at 35.[32]  To some extent, typicality and adequacy overlap – courts generally have found that if a named plaintiff's claims satisfy the typicality requirement, that plaintiff is also adequate to represent the class.  See Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 158 (S.D.N.Y. 2008) ("The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class."); see also Hicks v. Morgan Stanley & Co., No. 01 Civ. 10071, 2003 WL 21672085, at *3 (S.D.N.Y. July 16, 2003) (finding class representatives adequate when the complaint alleged a common course of conduct and unitary legal theory for the entire class period.)

Defendants argue that plaintiffs cannot meet the typicality or adequacy requirements because:  (1) their claims are subject to unique defenses; (2) plaintiffs either refuse or are unable to provide proper discovery; (3) the Steward Funds are religiously-based and raise concerns about their capacity to serve as a proper class

---

[32] Adequacy also requires a showing that plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation.  See In re Flag Telecom, 574 F.2d at 35.  However, since Court denies class certification in this case, plaintiffs' motion to appoint Robbins Geller as class counsel is rendered moot.

representative; and (4) the litigation is allegedly lawyer-driven.  (See Defs.' Class Opp'n at 16-24.)  Since the Court finds below that plaintiffs' claims are subject to unique defenses, it need not address the remainder of defendants' claims.

The presence of unique defenses may, in certain situations, defeat class certification.  See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990) (explaining that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation . . . [r]egardless of whether the issue is framed in terms of the typicality of the representatives claims . . . or the adequacy of the representation . . . ."); see also Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp., 222 F.3d 52, 59-60 (2d Cir. 2000) (finding that the district court did not abuse its discretion in denying a request to intervene as class representative because of her unique possible defenses) (citing Gary Plastics Packaging Corp., 903 F.2d at 180).

In Flag Telecom, the Second Circuit affirmed a finding that certain class representatives failed the typicality requirement for Rule 23 because they were subject to unique defenses as a result of having been "in and out" purchasers (buying and selling into and out of the securities at issue during the class period). 574 F.3d at 40-41; see also In re IMAX Secs. Litig., 272 F.R.D. 138, 147 (S.D.N.Y. 2010) (class representative was in-and-out trader and therefore subject to unique defenses, such that it could not meet the typicality requirement); Kline v. Wolf, 88 F.R.D. 696, 699 (S.D.N.Y. 1981 ) (denying class certification where named plaintiff

was in-and-out trader and therefore faced unique defenses), aff'd, 702 F.2d 400 (2d

Cir. 1983); Bensley v. FalconStor Software, Inc., 277 F.R.D. 231, 241 (E.D.N.Y.

2011) (refusing to appoint fund as lead plaintiff because it was subject to unique

defenses as an in-and-out investor); In re Bally Total Fitness Secs. Litig., Nos. 04 C

3530, 04 C 3634, 04 C 3713, 04 C 3844, 04 C 3864, 04 C 3936, 04 C 4342, 04 C 4697,

2005 WL 627960, at *6 (N.D. Ill. 2005) (refusing to appoint in-and-out trader as lead

plaintiff because it would have to establish that losses were actually caused by the

alleged fraudulent statements and would need to expend considerable resources to

do so); c.f. In re Smart Techs., Inc. S'holders Litig., No. 11 Civ. 7673, 2013 WL

139559, at *9 (S.D.N.Y. Jan. 11, 2013) (excluding in-and-out purchasers from the

class).

Here, each of the current named plaintiffs is an "in-and-out-trader."[33]  (See

Declaration of Brian Barrett in Opposition to Lead Plaintiffs' and IBEW Local 90

Pension Fund's Motion for Class Certification and to Include IBEW Local 90

Pension Fund as a Named Plaintiff ("Barrett Decl."), Ex. M, dated Aug. 29, 2013,

ECF No. 58.)  This fact alone defeats certification.  (See supra.)

---

[33] Throughout the Class Period – specifically on August 12, 2008 (180 GRSs),
October 14, 2008 (450 GRSs), and November 7, 2008 (200 GRSs) – Steward Global
Equity sold its GRSs; on February 9, 2009, it sold 19,660 GRSs.  (See Barrett Decl.
Ex. M. at 3.)  Steward International sold its GRS holdings on June 7, 2007 (160
GRSs), September 5, 2007 (130 GRSs), September 7, 2008 (20 GRSs), February 4,
2008 (130 GRSs), and on July 7, 2008 (200 GRSs).  (See id. at 5-6.)  On January 9,
2009, Building Trades sold 11,800 of its shares.  (See id. at 1.)

III.    Rule 23(b)

Class certification will be defeated if a plaintiff fails to meet the basic
requirements of Rule 23(a).  See, e.g., Wal-Mart Stores, Inc., 131 S.Ct. at 2556-57.
Plaintiffs here have failed to meet their burden under Rule 23(a).  However,
assuming arguendo that they carried that burden, class certification must
nonetheless be denied on the separate basis that they have failed to carry their
burden under Rule 23(b)(3) to show that common issues predominate over
individual ones.  See id.

    A.  Fraud-On-The-Market Theory

Here, the predominance issue relates to whether plaintiffs have
demonstrated that the DB GRSs traded in an efficient market – thereby allowing
the entire class to take advantage of the presumption of reliance set forth in Basic
Inc. v. Levinson for a "fraud-on-the-market" theory.  485 U.S. at 241-42.

The predominance requirement is intended to ensure that "the class will be
certified only when it would achieve economies of time, effort, and expense, and
promote uniformity of decision as to persons similarly situated, without sacrificing
procedural fairness or bringing about other undesirable results."  Myers v. Hertz
Corp., 624 F.3d 537, 547 (2d Cir. 2010) (quoting Cordes & Co. Fin. Servs., Inc. v.
A.G. Edwards & Sons, Inc., 502 F.3d 191, 104 (2d Cir. 2007) (internal quotation
marks and citations omitted)).

Reliance "is an essential element of the [Section] 10(b) private cause of
action."  Amgen Inc., 133 S.Ct. at 1192 (internal quotation marks and citation

omitted).  "'[P]roof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'"  Id. (quoting Erica P. John Fund, Inc. v. Halliburton Co., – U.S. – , 131 S.Ct. 2179, 2184-85 (2011)).

Recognizing the difficulties of proving direct reliance, in Basic, 485 U.S. at 241, the Supreme Court "endorsed the 'fraud-on-the-market' theory, which permits certain Rule 10b-5 plaintiffs to invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public." Amgen, Inc., 133 S.Ct. at 1192 (citing Basic, 485 U.S. at 241-49).  "The fraud-on-the-market theory rests on the premise that certain well developed markets are efficient processors of public information," and therefore, the price of a security at any given time reflects the impoundment (or inclusion) of that information.  Id. (citing Basic, 485 U.S. at 248).

The presumption of reliance is, however, just that – a presumption.  It is rebuttable. Amgen, 133 S.Ct. at 1193 (quoting Halliburton, 131 S.Ct. at 2185; Basic, 485 U.S. at 248-49).  "Absent the fraud-on-the-market theory, the requirement that Rule 10b-5 plaintiffs establish reliance would ordinarily preclude certification of a class seeking money damages because individual reliance issues would overwhelm questions common to the class." Amgen, 133 S.Ct. at 1193 (citing Basic, 485 U.S. at 242).

To defeat the presumption of reliance, defendants do not, therefore, have to show an inefficient market.  Instead, they must demonstrate that plaintiffs' proffered proof of market efficiency falls short of the mark.  That is precisely what defendants have done here.

In analyzing market efficiency, courts have generally turned to a series of factors most notably set forth in <u>Cammer v. Bloom</u>, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); <u>see</u> <u>Teamsters</u>, 546 F.3d at 200. The factors are: (1) the average weekly trading volume of the securities at issue; (2) the number of securities analysts reporting on or following the securities; (3) the extent to which market makers traded in the securities; (4) the extent to which the issuer was/is eligible to file an SEC Registration Form S-3; and (5) the demonstration of a cause and effect relationship between the unexpected, material disclosures and changes in the securities' price. <u>Cammer</u>, 711 F. Supp. at 1286-87. Here, defendants only contest the last <u>Cammer</u> factor — the cause and effect relationship.

In order for the fraud on the market theory to apply, plaintiffs must demonstrate that the securities at issue traded in an efficient market. In the absence of an efficient market, it is not clear that the assumptions underlying the fraud on the market theory can or should apply; whether or not certain material information (including the alleged misstatements or omissions) was impounded into the stock price cannot be assumed – it may or may not have occurred. <u>See, e.g.</u>, <u>id.</u> at 248, n.27; <u>In re Salomon Analyst Metromedia Litig.</u>, 544 F.3d 474, 481, n.4.

### a. Marek's Analysis of Market Efficiency

The Court has already discussed the shortcomings of Marek's analysis of market efficiency above. Here, the Court merely summarizes its conclusions.

Plaintiffs bear the burden of proving market efficiency – defendants do not. Therefore, the questions asked of defendants' experts at the evidentiary hearing as

46

to whether they conducted their own analysis of market efficiency are beside the point. The Court finds that Marek's failure to analyze the primary market in which the DB GRSs traded – namely, Germany – is fatal to his analysis. In the absence of any analysis that the information which Grundfest clearly demonstrated was first released in Germany (before the U.S. market even opened) was impounded into the price, there is an insufficient evidentiary basis to assert market efficiency.

In addition, Marek failed to take into account the three short sale bans in Germany and the U.S. that occurred during the Class Period. Marek acknowledged that arbitrage and short sales are aspects of maintaining market efficiency – and that a ban on short selling could impact market efficiency (see tr. at 25), yet he failed to consider their impact here. That, too, undermines the sufficiency of his conclusions regarding market efficiency.

In addition, Marek's analysis of market efficiency was based on an inadequate foundation of 12 trading days out of 515 – during a time in which a "sheer enormity" of information regarding DB was released into the market. The 12 days chosen corresponded to earnings disclosure dates – yet Marek testified that earnings would largely have been anticipated prior to formal disclosure. (See id. at 42-43.) Marek testified that liquidity was of more interest to the market vis-à-vis financial institutions during this period of the financial crisis – and while liquidity would be addressed in an earnings disclosure, Marek provided contradictory testimony as to whether liquidity would have been discussed at other points in time as well. (See id. at 49-52.)

Further, Gompers asserts that the choice of the 12 EDDs, particularly without any analysis of the materiality of information released on those dates, or whether price movements were directionally appropriate, undermines Marek's conclusions. (See Gompers Decl. ¶¶ 49-54.) The Court credits Gompers' testimony. Gompers is a highly qualified economist who has spent years studying, teaching, and publishing on market efficiency. The Court finds that his opinions were more grounded in recent academic literature, more sensible, and more credible than those of Marek.[34]

### b. Conclusion

In sum, Marek's analysis falls short of what plaintiffs needed to present to support a determination of market efficiency during the Class Period by a preponderance of the evidence. That DB GRSs may have traded at many other points in time in an efficient market is irrelevant (and not before the Court) – what is clear is that an analysis of market efficiency that ignores the main market which is impounding (or not) material information, and which ignores the fact that the Class Period encompasses an extraordinary financial crisis directly impacting trading conditions and the firm at issue, is fatally flawed.

As this Court has previously stated, class certification is a crucial inflection point in securities litigation – and requires a careful analysis of the Rule 23 factors.

---

[34] The parties spent a substantial amount of time in the declarations and at the evidentiary hearing debating the adequacy of the sample size for the particular type of "z-test" that Marek ran. (See, e.g., Gompers Decl. ¶¶ 45, 63-65; Marek 7/1 Decl. ¶¶ 71-72; Tr. at 66-68.) Given the number of other flaws and shortcomings in Marek's analysis, the Court finds it unnecessary to wade into these waters.

See George v. China Automotive Sys., Inc., No. 11 Civ. 7533, 2013 WL 3357170, at *1 (S.D.N.Y. July 3, 2013).  Here, plaintiffs have failed to meet their burden insofar as they have failed to prove by a preponderance of the evidence that the market for DB GRBs was efficient.

### B.  The Named Plaintiffs' Trading Patterns

Class certification is separately inappropriate here based on the particular trading patterns of the named plaintiffs.[35]  The named plaintiffs' trading patterns defeat predominance.  Defendants have presented evidence – uncontested by plaintiffs – that the two named plaintiffs both bought and sold DB GRSs during the Class Period (e.g., that they are in-and-out-traders).  (See Barrett Decl., Ex. M.) Indeed, both Building Trades and Steward Funds purchased and sold DB GRSs within the Class Period.  (See Barrett Decl., Ex. M.)  Each of the named plaintiffs also profited on some of the in-and-out-trades.  (See Defs.' Class Opp'n at 17.)  See George, 2013 WL 3357170, at *3, *7 (explaining that while not determinative, fact of making a profit with in-and-out-trading would cause time and resources on this issue at the expense of common issues.)

Here, the in-and-out-trading patterns of the named plaintiffs raise individualized questions regarding why they made their investments (was it in fact

---

[35] IBEW is not currently a named plaintiff (though it was originally).  (See supra at n.2.)  Plaintiffs have requested to have IBEW considered a named plaintiff.  (See id.)  There is no evidence that IBEW was an "in-and-out-trader;" however, since there is no presumption of reliance available here (see supra), this fact cannot save the class.  Accordingly, the Court declines to determine whether IBEW is appropriately alleged as a named plaintiff – resolution of that issue is irrelevant to the outcome of plaintiffs' motion for class certification.

reliance on the market?) and whether they have negative loss causation.  See In re Flag Telecom, 574 F.3d at 35-36; Smart Techns., 2013 WL 139559, at *8.  These individualized questions as to the named plaintiffs threaten to predominate over common questions.  Thus, these named plaintiffs cannot meet the "predominance" factor Rule 23(b)(3).

Accordingly, plaintiffs have failed to meet their burden pursuant to Rule 23 and class certification is denied.

## CONCLUSION

For the reasons set forth above, defendants' Daubert motion to preclude the testimony of Marek is GRANTED and plaintiffs' motion to certify the proposed class is DENIED.  The parties are directed to appear for a status conference in this matter on **January 6, 2013** at **9:30 a.m.**

The Clerk of Court is directed to terminate the motions at ECF Nos. 51 and 59.

Dated:      New York, New York
            October **29**, 2013

                                    _K. B. Forrest_
                                    KATHERINE B. FORREST
                                    United States District Judge